STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Ronald D. SORENSON, Defendant-Appellant.

Supreme Court

*No. 86–0124–CR. Argued October 7, 1987.—Decided March 22, 1988.*

(Also reported in 421 N.W.2d 77.)

For the defendant-appellant there was a brief by *Teresa M. Elguezabal, Robert J. Dreps* and *LaFollette & Sinykin,* Madison, and oral argument by *Teresa M. Elguezabal.*

For the plaintiff-respondent-petitioner the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

DAY, J. This is a review of a decision of the court of appeals, *State v. Sorenson,* 135 Wis. 2d 468, 400 N.W.2d 508 (Ct. App. 1986), which reversed the judgment of conviction for first degree sexual assault entered against Ronald G. Sorenson by Circuit Judge Wallace A. Brady for the circuit court of Juneau county. The court of appeals concluded that the circuit court had improperly admitted hearsay evidence at the defendant's preliminary hearing, and that the defendant's subsequent jury conviction must be reversed, since without this evidence probable cause would not have existed to bind the defendant over for trial. We conclude that the hearsay testimony concerning the minor victim's statements to a social worker about the sexual assault was admissible under the residual hearsay exception, sec. 908.045(6), Stats. We further conclude the other challenges raised by the defendant, alleging erroneous admission of hearsay testimony by an examining physician, lack of specificity of charging documents, failure of the state to establish a specific date of offense at trial, and concerning prosecutor's comments about the defendant's pre-trial silence after he elected to testify at trial on his own behalf, do not merit reversal.[1] Accordingly,

---

[1]These other issues were not reached by the court of appeals but were briefed and argued by the parties before that court. For

we reverse the court of appeals' decision and affirm the defendant's judgment of conviction.

On March 14, 1985, a Juneau County Department of Social Services social worker received a referral regarding possible sexual abuse of a seven year old girl, L.S. When interviewed by the social worker the day of the referral at her elementary school, L.S. would not discuss the matter, but asked the social worker to return the next day.

The following day, March 15, 1985, the social worker again met with L.S. Using "anatomically-correct" dolls, and crude, explicit language, L.S. reported that her uncle, Donald Sorenson, and her father, Ronald Sorenson, had sexual intercourse with her.

Based on this information, the social worker told a deputy sheriff that L.S. might have been sexually assaulted by her father and uncle. The deputy and the social worker then returned to the school and re-interviewed L.S., who again reported that Donald Sorenson had sexually assaulted her. The deputy asked L.S. if her father had done anything, but L.S., who had a limited attention span and an emotional age of approximately four years old, was "distracted" and did not answer.

The deputy advised Ronald Sorenson, when he came to pick his daughter up from school, that L.S. was being placed in a foster home because of Donald Sorenson's suspected sexual assault. Donald Sorenson was arrested on March 16, 1985. Three days later, on March 19, 1985, Ronald Sorenson was also arrested and charged with one count of first degree sexual intercourse with a child under the age of twelve years,

purposes of judicial economy, we reach these other issues raised by the defendant rather than remanding to the court of appeals for consideration.

sec. 940.225(1)(d), Stats.[2] The charging documents stated that this assault occurred between February 1, 1985 and March 15, 1985, which encompassed the six week period immediately preceding the social worker's second meeting with L.S.

At his preliminary hearing, Ronald Sorenson was excluded from the courtroom when his daughter was called as a witness. L.S. admitted being assaulted by her uncle. She agreed that she had told the social worker a "secret about daddy," but did not answer any questions concerning the incidence of sexual contact by her father despite the district attorney's use of anatomically-correct dolls and leading questions. Over defense counsel's objection, L.S. was declared an unavailable witness pursuant to sec. 908.04(1)(b), Stats.[3] The court did not formally order L.S. to testify because the judge concluded it would have been "fruitless" and "inappropriate" because of her young age.

The court then permitted questioning of the social worker concerning L.S.'s statements under an expanded interpretation of the hearsay exception for former testimony, sec. 908.045(1), Stats.[4] The court found

[2]Section 940.225(1)(d), Stats. (1985), states:

**Sexual assault. (1)** First degree sexual assault. Whoever does any of the following is guilty of a Class B felony: . . . (d) Has sexual contact or sexual intercourse with a person 12 years of age or younger.

[3]Section 908.04(1)(b), Stats., states:

**Hearsay exceptions; declarant unavailable; definition of unavailability. (1)** "Unavailability as a witness" includes situations in which the declarant: . . . (b) Persists in refusing to testify concerning the subject matter of his statement despite an order of the judge to do so.

[4]The hearsay exception for former testimony, sec. 908.045(1), Stats., reads:

sufficient veracity to support the admission of L.S.'s statements because they were made by a young child who was the daughter of the alleged perpetrator, because of the seriousness of the sexual assault allegation, and further based upon the child's reaction on the stand.

The social worker then testified that, about an hour into their interview, L.S. was asked if "her grandfather, her brother or her little boyfriend" had done anything to her. L.S. said that, in addition to her uncle, her father, Ronald Sorenson, had sexually abused her and that her father's acts had occurred while her mother was at the doctor. L.S. distinguished between the acts committed by her uncle, "Donnie," whom she reported had assaulted her on the couch in the living room, and her father, "Ronnie," whom she reported had assaulted her in the bathroom. She further described that she had to wipe herself off after her father assaulted her and that her father told her to tell her mother that she had "wet her pants." The social worker also demonstrated L.S.'s use of anatomically-correct dolls to describe the act. The social worker further testified that earlier during Ronald Sorenson's preliminary hearing, L.S. had told her that she had not testified about her father because "she [L.S.] was not going to have Daddy go to jail, Mommy

Hearsay exceptions; declarant unavailable. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, at the instance of or against a party with an opportunity to develop the testimony by direct, cross-, or redirect examination, with motive and interest similar to those of the party against whom now offered.

235

would be mad at her, she wouldn't get to go back home." The social worker also testified that during the period between L.S.'s removal from her home and Ronald Sorenson's arrest on March 19, 1985, Ronald had contacted her and inquired whether L.S. had said anything about him to her.

By stipulation of the parties, the testimony of a physician, who examined L.S. on March 18, 1985, was incorporated from the transcript of Donald Sorenson's preliminary hearing into the record of Ronald Sorenson's preliminary hearing. The physician testified that his examination of L.S. unquestionably revealed repeated sexual abuse. He further testified that, based on her physical condition, the most recent intercourse occurred between seven and ten days before his examination.

The testimony concerning L.S.'s statements to the social worker was the primary evidence linking Ronald Sorenson to the physical evidence of assault found by the physician who examined L.S. Based on this evidence, the circuit court found probable cause that the defendant, Ronald Sorenson, had committed a felony and bound him over for trial.

Before trial, the defendant moved to dismiss, arguing that the circuit court lacked jurisdiction over him because the probable cause determination was based on inadmissible hearsay. As an additional ground, he argued that the information failed to state with sufficient specificity the date of the alleged assault since it referred to a six week period, from February 1, 1985 to March 15, 1985, during which the assault allegedly occurred. Sorenson further moved to bar testimony at trial of the examining physician and social worker about L.S.'s statements to them, arguing

this testimony was inadmissible hearsay. The circuit judge denied these motions.

At trial the physician who had examined L.S. again testified that her physical condition indicated multiple acts of sexual intercourse over a period of time, with the last act probably occurring seven to ten days before he examined her on March 18, 1985 (or approximately between March 8th and 11th which was four to seven days before L.S. spoke with the social worker). He further testified that, at the time he examined her, L.S. had volunteered that her father as well as her uncle had assaulted her, differentiating between the places in her house where these assaults occurred. He also testified she further spontaneously drew a picture for him of a man with an "enormously distorted," "erect" penis and identified this person as "daddy."

L.S. herself testified at trial, after first correctly answering questions concerning whether she knew the difference between the truth and a lie. Using anatomically-correct dolls, she described that sexual intercourse had occurred between herself and her father. A video of L.S.'s testimony at Ronald Sorenson's preliminary hearing was then seen by the jury. In addition, a second video, made for the purposes of a juvenile placement hearing, was shown. In it, L.S. first stated that "Donnie" had assaulted her. Though initially not answering because she said she was "scared," after leading questions and use of anatomically-correct dolls she stated that "daddy" had assaulted her. She said she didn't tell her mother about what her father did because "it was a secret." Finally, a third video, taken during Donald Sorenson's preliminary hearing, was shown to the jury. This hearing occurred shortly after L.S. was taken from her home

237

and placed in foster care. In it L.S. changed her answers, first stating that "Ronnie," then that "Donnie," had assaulted her, and that this was a "secret." She answered "yes" when asked it she had lied to the social worker, and agreed that she had practiced her testimony with the social worker concerning the assaults. On cross-examination in that video, L.S. answered "yes" when asked if she had been assaulted by the defense attorney. On redirect, she nodded her head "no" when asked the same question, and later nodded her head "yes" when asked if she was confused.

The social worker's trial testimony confirmed the statements L.S. had made in her initial interviews. She stated, however, that she had miscalculated in her preliminary hearing testimony when L.S. had first spoken about her father's assault. Instead of occurring about an hour into the interview, she testified that this issue was raised only one-half hour into the process. The social worker also testified that she felt L.S. was able to distinguish between her father and her uncle because L.S. had indicated that she loved her father but did not like her uncle.

A clinical psychologist specializing in child abuse syndrome testified for the state that she had examined L.S. She found L.S. was deficient in being able to "sequence acts and times," she was distractible, her verbal ability was impaired, and she was very anxious. The psychologist also testified that, after several meetings with her, L.S. reported assaults by both Donald and Ronald Sorenson.

L.S.'s mother was called as a defense witness. She testified, among other things, that shortly before Ronald's preliminary hearing she had told L.S. not to say anything about her father at that hearing. She

testified that Donald had been alone with L.S. baby-sitting numerous times and that she believed that was when L.S. had been assaulted. On cross-examination she stated that Ronald might also have been alone with L.S. for short periods of time. She further testified that, in addition to her husband, Ronald, a person named Debbie had also driven her (L.S.'s mother) to the clinic for treatment of injuries she had sustained in an unrelated car accident.

Ronald Sorenson testified on his own behalf at trial. He stated he did not have sexual intercourse with his daughter. He also testified that he believed his brother, Donald Sorenson, had sexually abused her over a period of time. Ronald further stated that he had not been alone with his daughter for significant periods of time seven to ten days before March 18, 1985, and that he drove L.S.'s mother to the doctor each time she went. The district attorney asked Ronald why he had not volunteered the information concerning his brother when the deputy first informed him that his brother was a suspect, or at any other time prior to trial. Defense counsel objected and moved for mistrial on the grounds that these questions violated the defendant's rights to due process and to remain silent. The court denied this motion. During closing arguments, the district attorney again raised defendant's failure to volunteer information, suggesting that he had remained silent because Ronald knew he was also culpable.

The jury convicted Ronald Sorenson of one count of first degree sexual assault. He then appealed.

The court of appeals reversed the judgment of conviction, holding that the hearsay testimony at the preliminary hearing regarding L.S.'s statements was not admissible and as a result, no probable cause had

existed to bind Ronald Sorenson over for trial and the result reached in that trial was therefore void. The state then petitioned this court for review, challenging the exclusion of the hearsay statements.

The first issue raised on appeal by the parties regards the admissibility of the hearsay statements testified to by the social worker at the preliminary hearing. When reviewing evidentiary rulings, the reviewing court must determine whether the circuit court exercised its discretion in accordance with accepted legal standards and the facts of the record. *State v. Pharr,* 155 Wis. 2d 334, 342, 340 N.W.2d 498, 501 (1983). The reviewing court will not find an abuse of discretion if there is some reasonable basis for the lower court's determination. *In re Paternity of T.L.S.,* 125 Wis. 2d 399, 373 N.W.2d 55 (Ct. App. 1985).

The rules of evidence apply at a preliminary hearing. *Mitchell v. State,* 84 Wis. 2d 325, 330, 267 N.W.2d 349, 352 (1978); sec. 911.01(2), Stats. The parties do not dispute that L.S.'s statements were made outside of court and were offered to prove the truth of the matters asserted in them. They therefore constituted hearsay and were excludable under the hearsay rule, sec. 908.02, unless they were permitted under one of the hearsay exceptions. *See* secs. 908.03, 908.045.

At the preliminary hearing, the court admitted the hearsay statements under an "expanded" interpretation of the former testimony exception, sec. 908.045(1), Stats.[5] Section 908.045(1), requires the

[5]See footnote 4 for the full text of sec. 908.045(1), Stats.

testimony to be admitted as an exception to the hearsay rule be given at a prior judicial hearing or proceeding, or in a formal deposition. It also requires the opportunity of opposing counsel to develop testimony on cross-examination. Neither of these indicia of reliability were present when the social worker interviewed L.S. alone at school. Therefore, we conclude the requirements for use of this exception were not met.

The state argues that sec. 908.045(4), Stats.,[6] the exception for statements which are against the declarant's interest, might be used to admit the hearsay. The record shows that L.S. expressed concern to the social worker about the effects of her testimony during Ronald Sorenson's preliminary hearing. It was not established, however, that, at the time of the interview with the social worker when the statements were first made, L.S. was cognizant of the impact of her statements about her father. Section 908.045(4), specifically requires this showing to substantiate the veracity of such a statement. Though the state argues this might be readily inferred, in the absence of a fully-developed record concerning this aspect, we do not address this exception but turn to analysis of the residual hearsay exception and its application to the facts of this case.

---

[6]Section 908.045(4), Stats., reads in pertinent part:

**Hearsay exceptions; declarant unavailable.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: ... (4) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, ... or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. ...

The residual hearsay exception permits admission of hearsay evidence, not specifically enumerated in other exceptions, which possesses "comparable circumstantial guarantees of the trustworthiness." As the state correctly notes, this residual exception exists whether the declarant is available to testify, sec. 908.03(24), Stats.,[7] or is unavailable, sec. 908.045(6).[8]

The residual hearsay exception was initially created as part of the Federal Rules of Evidence and adopted in Wisconsin as part of Chapter 908 in 1974.

[7]Section 908.03(24), Stats., reads:

**Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . **(24)** Other Exceptions. A statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness.

[8]Section 908.045(6), Stats., reads:

**Hearsay exceptions; declarant unavailable.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . **(6)** Other Exceptions. A statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness.

Under sec. 908.04(1)(b), Stats., a declarant must persist in refusing to testify despite an order of the judge to do so. The record shows that no order was made in this case because the judge determined it was futile in light of L.S.'s young age. We will treat L.S. as "unavailable" for the purposes of our analysis despite this omission because the court made adequate findings, supported by the record, of the prosecutor's good faith demonstration of L.S.'s unavailability when she refused to testify at the preliminary hearing. *See State v. Buelow,* 122 Wis. 2d 465, 474–475, 363 N.W.2d 255, 261 (Ct. App. 1984) (witness who refused to testify held unavailable under sec. 908.04(1)(b), Stats.); *State v. Gollon,* 115 Wis. 2d 592, 600, 340 N.W.2d 912, 915–916 (Ct. App. 1983). Under different factual circumstances, use of the residual exception for available declarants, sec. 908.03(24), Stats., may be equally applicable in examining admissibility of hearsay statements of young children in sexual assault cases.

The Federal Advisory Committee Notes, 59 Wis. 2d R301, R302, R323 (1974), explain that it was designed because not every hearsay contingency was anticipated by specific rules. This exception was to provide flexibility needed to permit growth and development in the law of evidence. While not contemplating unfettered judicial discretion, its use was intended to allow admission of evidence under new and unanticipated situations which demonstrate a trustworthiness consistent with that required under other specifically stated exceptions.

The Wisconsin Judicial Council Committee Note, 59 Wis. 2d R301 (1974), specifically mentions hearsay in child sexual assault cases as an example of the potential use of the residual exception. We conclude there is a compelling need for admission of hearsay arising from young sexual assault victims' inability or refusal to verbally express themselves in court when the child and the perpetrator are sole witnesses to the crime. In the absence of a specific hearsay exception governing young children's statements in sexual assault cases, use of the residual exception is an appropriate method to admit these statements if they are otherwise proven sufficiently trustworthy.

To apply the residual exception requires establishment of "circumstantial guarantees of trustworthiness" comparable to those existing for enumerated exceptions. Sec. 908.045(6), Stats. The guarantees of trustworthiness which are found in the enumerated hearsay exceptions have been consolidated by Wigmore in his treatise on evidence as resting upon one or more of the following underlying premises:

243

"a. Where the circumstances are such that sincere and accurate statement would naturally be uttered, and no plan of falsification be formed;
b. Where, even though a desire to falsify might present itself, other considerations such as the danger of easy detection or the fear of punishment would probably counteract its force;
c. Where the statement was made under such conditions of publicity that an error, if it had occurred, would probably have been detected and corrected." 5 J. Wigmore, *Evidence* sec. 1423 at 254 (Chadbourn rev. 1974).

In Wisconsin, comparable circumstances meeting these underlying requirements have been elaborated upon in several cases concerning sexual abuse of children. Most notably, *State v. Bertrang,* 50 Wis. 2d 702, 708, 184 N.W.2d 867, 870 (1971), discussed factors pertinent to establishing the type of guarantees contemplated by Wigmore:

"Each case must be viewed on its particular facts and in exercising its discretion of whether to admit testimony about statements made by a [young child], the trial court should consider the age of the child, the nature of the assault, physical evidence of such assault, relationship of the child to the defendant, contemporaneity and spontaneity of the assertions in relation to the alleged assault, reliability of the assertions themselves, and the reliability of the testifying witness."

Subsequent to the adoption of the Wisconsin Rules of Evidence, this court has expansively applied the excited utterance exception, sec. 908.03(2), Stats, in child sexual assault cases. Though not made in immediate temporal relation to incidents which are

the focal point of their statements, this court has held statements made by young children concerning sexual assault to be sufficiently contemporaneous and spontaneous to be admissible. *See, e.g., State v. Padilla,* 110 Wis. 2d 414, 420, 329 N.W.2d 263, 266 (Ct. App. 1982); *State v. Gilbert,* 109 Wis. 2d 501, 515 n. 21, 326 N.W.2d 744, 751 n. 21 (1982). Use of the residual exception in child sexual assault cases is even less reliant upon immediacy of statements because other indicia of reliability support its trustworthiness. *See* Judicial Council Committee Note, 59 Wis. 2d R301 (1974). Following the principles set forth in *Bertrang* and *Wigmore,* we conclude that a court in making an assessment of the admissibility of a child's statements under the residual exception, should weigh the following factors, which need not be exclusive areas of inquiry:

First, the attributes of the child making the statement should be examined, including age, ability to communicate verbally, to comprehend the statements or questions of others, to know the difference between truth and falsehood, and any fear of punishment, retribution or other personal interest, such as close familial relationship with the defendant, expressed by the child which might affect the child's method of articulation or motivation to tell the truth.

Second, the court should examine the person to whom the statement was made, focusing on the person's relationship to the child, whether that relationship might have an impact upon the statement's trustworthiness, and any motivation of the recipient of the statement to fabricate or distort its contents.

Third, the court should review the circumstances under which the statement was made, including relation to the time of the alleged assault, the avail-

ability of a person in whom the child might confide, and other contextual factors which might enhance or detract from the statement's trustworthiness.

Fourth, the content of the statement itself should be examined, particularly noting any sign of deceit or falsity and whether the statement reveals a knowledge of matters not ordinarily attributable to a child of similar age.

Finally, other corroborating evidence, such as physical evidence of assault, statements made to others, and opportunity or motive of the defendant, should be examined for consistency with the assertions made in the statement.

The weight accorded to each factor may vary given the circumstances unique to each case. It is intended, however, that no single factor be dispositive of a statement's trustworthiness. Instead, the court must evaluate the force and totality of all these factors to determine if the statement possesses the requisite "circumstantial guarantees of trustworthiness" required by sec. 908.045(6), Stats.

We next apply this analysis to the statements made by L.S. to the social worker. As the record shows, L.S. was mentally and emotionally at about a four year age level. It has been noted previously that a child at such a young age is unlikely to review an incident of sexual assault and calculate the effect of a statement about it. *Padilla,* 110 Wis. 2d at 422, 329 N.W.2d at 266; *see also United States v. Nick,* 604 F.2d 1199, 1204 (9th Cir. 1979). This would tend to support the veracity of the child's report of sexual abuse by her father. In this case, however, reliability of the hearsay statement is subject to a more careful scrutiny because we are presented with a child whose verbal

skills and attention span were at a lower level than her chronological age. Nonetheless, the evidence that L.S. considered the acts committed by those who assaulted her to be "secret," and her fears about removal from her home and anger or retribution by her mother were strong influences which might have otherwise impeded free and immediate communication. *See* Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations,* 98 Harv. L. Rev. 806, 807 n. 13–15 (1985). Confusion and unresponsiveness under these circumstances may be accorded less weight, particularly when they occur in a courtroom which may be imposing, if not intimidating, to a young child, unless deliberate falsity is otherwise shown. We note that nowhere in the record of this case is there evidence of deliberate fabrication on the part of L.S.

The second factor in assessing trustworthiness involves examination of the person to whom the statement is made. L.S. confided in a social worker who, the record indicates, had experience with counseling and child sexual abuse cases. This social worker may have been able to convince an otherwise reticent child of the need to speak out and that she would be protected if a statement was made. *See State v. Superior Court, Pima County,* 149 Ariz. 397, 404, 719 P.2d 283, 290 (Ct. App. 1986) ("A very young child sexually abused by a parent who has no clear understanding of the incident may not report it immediately and the child's initial statements often consist of responses to the questioning of a persistent, trusted adult."). Additionally, we find no evidence of a possible motive for this social worker to fabricate or distort statements made by L.S. Contrary to defense's asser-

tions that the social worker tried to coerce the child into inculpating her father, it appears the social worker refrained from even mentioning her father until L.S. raised the matter herself. Moreover, motivation to coerce L.S. into making such a statement is not found. The social worker gained no advantage from this additional information which might have bolstered the decision to remove L.S. from the home, since the child could have been removed based solely on the uncle's assault. Finally, the circuit judge at preliminary hearing had the opportunity to observe the demeanor of the social worker on both direct and cross examination, and concluded that she was a credible witness. In the absence of a contrary showing upon the record, we accord deference to the circuit court finding of witness credibility. *Roeske v. Diefenbach,* 75 Wis. 2d 253, 258, 249 N.W.2d 555, 558 (1977) (where facts are disputed, reviewing court will defer to lower court fact-finding).

The circumstances under which L.S. made her statement lend some support for the trustworthiness of the hearsay. The record shows that L.S. was assaulted approximately four to seven days prior to revealing that information to the social worker. "[T]he fact that the assertions [concerning sexual assault] are not made within a few minutes or even hours of the alleged assault is not controlling, nor is the fact that they are not volunteered but made in response to questions." *Bertrang,* 50 Wis. 2d at 707, 184 N.W.2d at 870 (footnotes omitted); *see also State ex rel. Harris v. Schmidt,* 69 Wis. 2d 668, 230 N.W.2d 890 (1975) (statements made by five year old boy to defendant's probation officer fifteen days after sexual assault were admissible); *D.A.H. v. G.A.H.,* 371 N.W.2d 1 (Minn. Ct. App. 1985) (admissibility of child sexual assault victim

hearsay under residual exception). Contemporaneity and spontaneity of statements are not as crucial in admitting hearsay statement of young sexual assault victims under the residual exception. Considering her limited mental and verbal capabilities and her fears concerning disclosure, L.S.'s statements concerning her father, made not immediately but an hour into the interview, were still sufficiently contemporaneous to be considered reliable in conjunction with other factors supporting the veracity of her statements.

Additional support for the trustworthiness of the hearsay is found in the content of L.S.'s statements. Her description of specific incidents of sexual assault, her familiarity and crude terminology for sexual organs, and her demonstration of the act of sexual intercourse with anatomically-correct dolls established knowledge well beyond the ordinary familiarity of a child her age. A young child is unlikely to fabricate a graphic account of sexual activity because it is beyond the realm of his or her experience. *See, e.g., State v. McCafferty,* 356 N.W.2d 159, 164 (S.D. 1984); *State v. Robinson,* 735 P.2d 801, 811–812 (Ariz. 1987). Defendant contends such knowledge could be solely attributable to the acts of L.S.'s uncle. We disagree. L.S. consistently differentiated between assault by her uncle and by her father, both verbally and in demonstrating with anatomically-correct dolls, using the names "Donnie," and "Ronnie" or "daddy." She further consistently distinguished between the places of assault, noting that her father assaulted her in the bathroom when her mother was at the doctor, and volunteered statements her father made about wiping herself off and telling her mother she had wet her pants. All of these facts suggest a knowledge derived

from a source in addition to her experience with her uncle.

Finally, other circumstantial evidence corroborates, or at the very least does not conflict with, L.S.'s statements. The physical evidence of sexual assault testified to by the physician who examined L.S. showed multiple incidents of sexual intercourse, with the most recent act occurring within a week before L.S. made her statements to the social worker. Though this does not conclusively establish the perpetrator of the abuse, it supports her report of multiple assaults. Other circumstantial evidence establishing that L.S. lived with her father during the period when the assaults ostensibly occurred is consistent with L.S.'s statements about when the assault occurred, and provided the defendant with the opportunity to commit the crime.

Examining the totality of factors, we conclude that L.S.'s statements to the social worker possessed sufficient guarantees of trustworthiness to be admissible at preliminary hearing under the residual hearsay exception, sec. 908.045(6), Stats.[9] Though we note that the circuit court admitted this testimony under another hearsay exception, this court will not reverse a lower court decision where that court has exercised its discretion based on a mistaken view of the law if the facts and their application to the proper legal analysis support the lower court's conclusion. *See State v.*

---

[9]Relying on the factor analysis used to admit the preliminary hearing hearsay testimony testified to by the social worker, this hearsay was equally admissible when testified to by the social worker at trial under the residual exception where availability of the declarant is immaterial, sec. 908.03(24), Stats.

*D'Aquisto,* 124 Wis. 2d 758, 762, 370 N.W.2d 781, 784 (1985).

Probable cause is satisfied at a preliminary hearing when there exists a believable or plausible account of the defendant's commission of a felony. *State v. Dunn,* 121 Wis. 2d 389, 398, 359 N.W.2d 151, 155 (1984). The trier of fact is not engaged in determining the truthfulness of the state's case but merely whether, if believed, it would support a bindover. *Virgil v. State,* 76 Wis. 2d 133, 144, 250 N.W.2d 378, 384 (1977). On review, this court need only find any substantial ground based on competent evidence to support the exercise of the circuit court's judgment. *State ex rel. Hussong v. Froelich,* 62 Wis. 2d 577, 583, 215 N.W.2d 390, 394 (1974). L.S.'s statements to the social worker, in conjunction with the physical evidence of sexual assault, provided sufficient evidence to plausibly conclude that Ronald Sorenson had committed a crime. Therefore, we hold the circuit judge's finding of probable cause binding Sorenson over for trial was proper.

In the next issue raised by the defendant, he similarly contends that the testimony at preliminary hearing and trial of the examining physician about L.S.'s statements to him was inadmissible hearsay. The record in this case shows that not only was admissibility of the transcript of the physician's testimony at preliminary hearing not objected to by defense counsel, it was agreed to by voluntary stipulation prior to that hearing.

The physician's testimony at trial, which the defendant objected to, included hearsay in which L.S. identified her uncle and father as having sexually

assaulted her, and included a description of her drawing of a sexually explicit picture which she identified as her father. In *State v. Nelson,* 138 Wis. 2d 418, 406 N.W.2d 385 (1987), hearsay statements of a four year old sexual assault victim identifying her father as her assailant were admissible under sec. 908.03(4), Stats., as statements made for the purposes of diagnosis and treatment, in testimony given by a psychologist who had treated the child. The *Nelson* court noted that even a child as young as three or four years of age understands statements made to a physician or psychologist will be used to ease the child's physical and emotional or psychological pain. *Id.,* 138 Wis. 2d at 432, 406 N.W.2d at 391. The court further stated, "while treatment of a physical injury would rarely require disclosure of the identity of the assailant, it is recognized that disclosure of the identity of the assailant is reasonably necessary to provide treatment for a victim of child abuse." *Id.* 15 433–34, 406 N.W.2d at 391 (citations omitted). Applying these holdings in *Nelson,* we conclude the information which identified L.S.'s father and uncle was pertinent to the making of a diagnosis consistent with her physical and emotional condition as a child who had been repeatedly sexually abused, and was further pertinent for the treatment of her physical wounds and emotional trauma. Therefore, the physician's hearsay testimony at trial concerning L.S.'s statements was admissible under sec. 908.03(4), as statements made for the purposes of medical diagnosis or treatment.

The third issue raised by the defendant is that the charging documents lacked sufficient specificity as to the date of the offense. In particular, the defendant

objects because a six week period of time was alleged during which the offense purportedly occurred.

The due process clause of the Wisconsin Constitution, art. I, sec. 8, and art. I, sec. 7 of the Wisconsin Constitution and the sixth amendment to the United States Constitution guarantee the accused's right to be informed of the nature and cause of the accusation against him or her. In *Holesome v. State,* 40 Wis. 2d 95, 102, 161 N.W.2d 283, 287 (1968), this court articulated a test for establishing adequacy of a complaint consistent with these constitutional requirements:

> "In order to determine the sufficiency of the charge, two factors are considered. They are, whether the accusation if such that the defendant determine [sic] whether it states an offense to which he is able to plead and prepare a defense and whether conviction or acquittal is a bar to another prosecution for the same offense." (Footnote omitted.)

On appeal, defendant challenges the charging documents only because they lack specificity as to when the crime was committed. As a result, he claims this deprived him of a full ability to plead and prepare a defense.

In *State v. George,* 69 Wis. 2d 92, 96, 230 N.W.2d 253, 256 (1975), this court held that the time of commission of a crime need not be alleged with precision where it is not a material element of the offense charged. Additionally, this court has previously upheld the sufficiency of an information which alleged the occurrence of an act of sexual assault within a four week period. *Gutenkunst v. State,* 218 Wis. 96, 259 N.W. 610 (1935). The *Gutenkunst* court said:

"The informality and lack of definiteness in ... the information is not prejudicial to the defendant. If the act occurred, as alleged, on any day between June 1st and June 30th, the defendant may properly be found guilty thereof. The fact that a witness cannot recall the exact day of an occurrence may in some instances go to the weight of the testimony, but cannot and ought not prevent the prosecution of one committing the act." *Id.* at 104, 259 N.W.2d at 614.

We find nothing in this record to support a claim that Ronald Sorenson was in fact impeded in the preparation of his defense or that his constitutional rights were unduly affected. As a practical matter, the circuit court noted that the parties stipulated prior to the preliminary hearing to the admission of testimony of a physician who narrowed the occurrence of sexual contact to a specific three day period. The state charged the defendant with a single criminal act and its sole witness to that act was a young child of diminished mental capacity, who as a result was unable to supply a particular date of occurrence. Under these circumstances, we find no harmful error in the form of time delineation set forth in the charging documents.

Fourth, the defendant argues that the state failed to prove a single date of offense at trial and as a result, he was denied his right to a unanimous jury verdict. We disagree. At trial the state relied in part on circumstantial evidence, provided by the doctor who examined L.S., of an incident of sexual assault occurring approximately one week before Sorenson was arrested. While under other circumstances greater

specificity might have been possible, the failure to prove the specific date of an offense is not fatal to the state's case against a defendant. *Thomas v. State,* 92 Wis. 2d 372, 386, 284 N.W.2d 917, 924–925 (1979). Additionally, the instructions given to the jury prior to their deliberation stated:

> "The defendant, Ronald Sorenson, is charged with one count of sexual assault. However, evidence has been introduced that the victim in this case, [L.S.], has been sexually assaulted on more than one occasion; any one of these acts which might constitute a charge of sexual assault.

> Before you may return a verdict of guilty, all 12 jurors must be satisfied beyond a reasonable doubt that the defendant committed the same act and that that act constituted the crime charged and that that act took place between February 1 and March 15 of 1985."

The jury returned a unanimous verdict finding Ronald Sorenson guilty of one count of sexual assault of a child under the age of twelve years. There is no showing that the jury failed to reach a consensus as to a single incident as required by the jury instructions. As a result, we conclude no error was committed. *See State v. Gustafson,* 112 Wis. 2d 369, 378–379, 332 N.W.2d 848, 852–853 (Ct. App. 1983).

Finally, the defendant argues that the state violated his constitutional rights to due process and to remain silent by commenting during cross examination and during closing argument upon his silence. The case law developed concerning prosecution's comment on a defendant's silence delineates admissibility based upon when and under what circumstances the remarks were made.

In *Doyle v. Ohio,* 426 U.S. 610, 619 (1976), the United States Supreme Court held that use for impeachment purposes of a defendant's post-*Miranda* silence violated the due process provision of the fourteenth amendment. *Doyle* concluded that post-arrest silence is "insolubly ambiguous" because of what the defendant must be advised under *Miranda v. Arizona,* 384 U.S. 436 (1966), and noted:

> "While it is true that the *Miranda* warnings contain no express assurance that the silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618 (footnote omitted); *accord State v. Fencl,* 109 Wis. 2d 224, 233–234, 325 N.W.2d 703, 709 (1982).

The scope of this prohibition was later addressed in *Jenkins v. Anderson,* 447 U.S. 231 (1980). The *Jenkins* Court held that it was neither a violation of a defendant's fifth amendment right to remain silent nor a denial of fundamental fairness under the fourteenth amendment to use pre-arrest silence to impeach the credibility of a defendant who elected to take the stand in his own defense. *See also Raffel v. United States,* 271 U.S. 494 (1926). The Court stated:

> Once a defendant decides to testify, "[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Jenkins,* 447 U.S. at 238 (citation omitted).

The Court confirmed the importance of using the "traditional truth testing devices of the adversary process," allowing the prosecution to test the veracity of the defendant, who is under the obligation to speak truthfully. *Id.* (quoting *Harris v. New York,* 401 U.S. 222, 225 (1971)).

In *Fletcher v. Weir,* 455 U.S. 603, 606 (1982), the Supreme Court further clarified that arrest, by itself, was not governmental action which implicitly induces a defendant to remain silent, and that *Doyle* only barred the use against a defendant of silence maintained after receipt of governmental assurances contained in *Miranda* warnings. The Court concluded:

> "In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." *Fletcher,* 455 U.S. at 607; *see also Greer v. Miller,* — U.S. —, 107 S. Ct. 3102, 3107–08 (1987); *Feela v. Israel,* 727 F.2d 151, 157 (7th Cir. 1984).

The *Fletcher* Court did not expressly state whether the fifth amendment right to remain silent might prevent use of post-arrest, pre-*Miranda* silence. We conclude such an inference cannot be implicitly derived in light of the express analysis in *Jenkins* reaching a contrary conclusion. Moreover, the longstanding rationale of *Raffel* states:

> "We need not close our eyes to the fact that every person accused of a crime is under some pressure to testify, lest the jury, despite carefully framed instructions, draw an unfavorable inference from his silence. When he does take the stand, he is under the same pressure: to testify fully, rather

than avail himself of a partial immunity. ... We can discern nothing in the policy of the law against self-incrimination which would require the extension of immunity to any trial or to any tribunal other than that in which the defendant preserves it by refusing to testify." *Id.* 271 U.S. at 499.

*See also Jenkins,* 447 U.S. at 237 n. 4 ("no Court opinion decided since *Raffel* has challenged its holding that the Fifth Amendment is not violated when a defendant is impeached on the basis of his prior silence").

We adopt the analysis used by the United States Supreme Court in *Jenkins* and *Fletcher,* allowing probative comment on a defendant's pre-*Miranda* silence when the defendant elects to testify on his or her own behalf. A contrary position would allow defendants, who have not been induced by government action to remain silent, to wrongfully manipulate the rules of evidence, and cripple the state's ability to address all the evidence presented by the defendant at trial. Moreover, once a defendant elects to take the stand, any comment by the prosecution regarding defendant's pre-*Miranda* silence may be explored and explained by defendant's own counsel on redirect. This protection more than adequately shields against any potentially misleading inference which might be drawn from the prosecution's references.

In *Fencl,* 109 Wis. 2d at 236, 325 N.W.2d at 711, this court stated that a defendant's fifth amendment guarantee against self-incrimination protects against references to pre-*Miranda* silence. *Fencl,* however, is distinguishable on its facts from the present action in that the defendant in *Fencl* at no time elected to testify. As the Court in *Jenkins* makes clear, the

258

admissibility of these statements is tied directly to the defendant's choice to take the stand and upon the need for rigorous examination for the truth of the defendant's in-court statements outweighing the earlier choice to remain silent. We therefore limit the application of comments in *Fencl* which would otherwise apparently conflict with the holdings in *Jenkins* and *Fletcher* to those cases in which the defendant does not elect to take the stand and thereby waive the right to protect pre-*Miranda* silence from comment.

The defendant further argues that art. I, sec. 8 of the Wisconsin Constitution,[10] which protects against self-incrimination, might be interpreted more liberally than federal fifth amendment provisions[11] to shield his silence. In the past, our cases interpreting the right to remain silent have paralleled federal analysis used for the United States Constitution and Amendments. *See, e.g., Odell v. State,* 90 Wis. 2d 149, 153, 279 N.W.2d 706, 708 (1979); *Rudolph v. State,* 78 Wis. 2d 435, 442, 254 N.W.2d 471, 473–74 (1977); *Reichhoff v. State,* 76 Wis. 2d 375, 379–80, 251 N.W.2d 470, 472–74 (1977). Further, in comparing the language of the federal self-incrimination provision with that of the Wisconsin section, we note the federal amendment uses the word "shall," while the Wisconsin Constitution uses the word, "may." While both protect against

---

[10]Article I, section 8 of the Wisconsin Constitution reads, in pertinent part:

> No person ... *may* be compelled in any criminal case to be a witness against himself or herself. (Emphasis added.)

[11]The Fifth Amendment of the United States Constitution states, in pertinent part:

> No person .... *shall* be compelled in any criminal case to be a witness against himself .... (Emphasis added.)

self-incrimination there can be no logical argument that the state constitutional provision creates a broader right since the language of the Wisconsin Constitution is certainly no stronger than that used in the United States Constitution. As a result, we find no basis for interpreting state constitutional �annguage beyond the articulated scope of federal constitutional guarantees in this case.[12]

Applying the law to the facts pertinent to this issue, the defendant alleges constitutional error occurred in the following questioning during cross-examination, at the conclusion of which defense counsel objected and moved to strike:

> "PROSECUTOR: Now the testimony here today by Gail, and by yourself indicates you were, that Donnie had babysat for you on this date, that day, he was alone with [L.S.] at this time, that time, did

---

[12]The Wisconsin cases cited by Justice Bablitch in his concurrence to support the conclusion that a state constitutional right against self-incrimination protects post-arrest, pre-*Miranda* silence are inapposite to this case. In *State v. Wedgeworth,* 100 Wis. 2d 514, 302 N.W.2d 810 (1981), and *State v. Fencl,* 109 Wis. 2d 224, 325 N.W.2d 703 (1982), the defendant did not testify at trial and therefore did not waive his right to silence by taking the stand. In *State v. Neely,* 86 Wis. 2d 304, 272 N.W.2d 381 (Ct. App. 1978), aff'd., 97 Wis. 2d 38, 292 N.W.2d 859 (1980), and *Reichoff v. State,* 76 Wis. 2d 375, 251 N.W.2d 470 (1977), reference to defendant's silence was made in the state's case in chief rather than in response to evidence produced by the defendant testifying for the first time at trial. Contrary to the position that Justice Bablitch asks this court to adopt, no Wisconsin case has expressly held that a defendant's post-arrest, pre-*Miranda* silence is shielded by art. I, sec. 8 when the defendant waives his right to silence and testifies for the first time at trial.

you give any of that information to the police at the time of Donald's arrest?

"DEFENDANT: I can't remember if I did or not.

"PROSECUTOR: You didn't make a written statement to the police about Donald?

"DEFENDANT: They didn't ask for one.

"PROSECUTOR: And all this information that you have testified to, and that Gail testified to, that Donald was alone with [L.S.] on this date and that day, this day, this time, that is or has never been given to the police in a written statement, has it?

"DEFENDANT: I don't know.

"PROSECUTOR: You have never given them a written statement to that effect, have you. ...

"PROSECUTOR: In fact the first time that these dates, these times, these places, the association between [L.S.] and Donald, the first time they have come up is during this trial."

The defendant further contends that references to his silence made by the prosecution during closing argument were prejudicial:

"[T]here are no statements, no help given to the police by Ronald Sorenson, or by Gail Sorenson, those persons that had the facts, those persons that knew on March 7th Donald Sorenson was with [L.S.], knew on March 8th Donald Sorenson was with [L.S.], knew on March 14th Donald Sorenson was with [L.S.], never once told the police about it, never once, and here we get to trial, the trial of Ronald Sorenson, suddenly all this evidence is right there, see, I will show you, I know that Donnie did it because he was with her here, here, here and there. If he watned [sic] to get Donald

Sorenson, he knew that he assaulted his daughter like he testified to today, they [sic] why didn't he give that information to the police months ago, I mean months ago, this is September, Ronald Sorenson was arrested on the 19th of March, Donald was arrested on the 16th of March, never once did Ronald Sorenson tell the police that Donald Sorenson was alone with [L.S.], for a number of days, but it works in real conveniently now, let's shift the blame, let's put his hand in the cookie jar, let's make him look like a bad guy, he is the bad guy. ... from March 18th to September 10th they knew [L.S.] had been assaulted, and yet they never gave a statement to the police stating what Donnie had done over those periods of time, that is because nobody asked them, I see, well, I guess that is one explanation, but if Donald Sorenson is the animal that Ronald Sorenson, Gail Sorenson, Arlene Sorenson, Anna Mae Sorenson and Mrs. Nagelus would like you to believe, then I think somebody might have said something to the police that would help them in their investigation, help to get Donald Sorenson the help that he needs, but no, that was saved for trial."

An additional reference, made in the state's rebuttal during closing arguments, is also contested:

"Why didn't Ronald Sorenson get more angry at his brother when he found out he was abusing his daughter, because his hand was in the cookie jar too, and if he told about his brother, his brother was going to tell about him."

Though comments made relative to Sorenson's pre-*Miranda* silence were admissible, a portion of the comments during both cross-examination and closing argument dealt with defendant's silence after he had

been given *Miranda* warnings. We conclude these references created constitutional error.

The state argues, if a finding of constitutional error is made, that the error was harmless beyond a reasonable doubt.

> "A constitutional error is harmless beyond a reasonable doubt if there is no reasonable possibility that the error might have contributed to the conviction. We have considered the following factors in determining whether a constitutional error was harmless beyond a reasonable doubt: (1) the frequency of the error; (2) the nature of the state's evidence against the defendant; and (3) the nature of the defense. ... The unconstitutional references ... cannot be viewed in a vacuum but, rather, must be examined within the entire context of the trial." *Fencl,* 109 Wis. 2d at 238, 325 N.W.2d at 711–712 (citations omitted).

Applying the first part of this test to this case, the facts show that during cross-examination a single incident of questioning explored defendant's entire silence prior to trial. Only questioning concerning his pre-*Miranda* silence was admissible by the prosecution; the overlap into post-*Miranda* silence was improper. This brief and isolated questioning did not continue after defense objected, but ceased, despite the fact that the circuit judge overruled the objection. 

There were also several comments made by the prosecutor during closing argument. These, again, included broad encompassing references, which included defendant's silence from the time of receipt of *Miranda* warnings until trial. The record shows, however, that no objection was made by defense counsel about these improper comments. Failure to

raise error is indicative of counsel's view of the seriousness of that error. *Odell,* 90 Wis. 2d at 155, 279 N.W.2d at 709. Moreover, while no formal instruction to ignore those closing argument comments was made by the court because no objection had been lodged by defense counsel, the prosecutor, of his own volition, stated during closing argument:

> "What I say here or what [defense counsel] says to you later is not intended to be considered as evidence by you. If our version of the facts don't necessarily agree with your recollection, go with your recollection, that is what you are required to do, you are the ones that decide what the testimony was, what the facts were, how they are to be determined."

We further conclude under the second part of the *Fencl* test, that the nature of the admissible direct and circumstantial evidence presented by the state was sufficiently strong that, when compared with the infrequency of the inadmissible comments by the district attorney, the outcome of the case was not affected. The testimony of the defendant's daughter, combined with the evidence of repeated sexual assault testified to by the examining physician, and evidence of Sorenson's opportunity to be alone with L.S., were sufficient evidence on which the verdict could rest.

Moreover, examining the nature of defendant's defense, which was essentially one of alibi, we are not persuaded any harm resulted from the prosecutor's comments. The evidence showed, in spite of testimony produced by defense suggesting only the uncle, Donald, had access to the child, that the defendant lived in the same house with L.S. and had the opportunity to

be alone with her during the time when the assault most likely occurred. The defendant's alibi of nonaccessibility to L.S., which was in fact contradicted by defendant's own witnesses, was in no way hinged on his maintenance of silence either before or after *Miranda* warnings were given to him. Upon examination of all three factors in the context of the entire trial, we find that the constitutional error was harmless beyond a reasonable doubt.

*By the Court.*—The decision of the court of appeals is reversed.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). Because the prosecution's references to the defendant's silence are harmless beyond a reasonable doubt, we need not decide whether the state's conduct violates the federal or state constitution. See *Fencl v. Abrahamson,* — F.2d —, No. 86–1813, slip op. at 11 (7th Cir. March 9, 1988); *United States v. Blanton,* 730 F.2d 869, 876 (11th Cir. 1984).

BABLITCH, J. (*concurring*). I disagree with the majority's holding that a defendant's pre-*Miranda* silence may be used to impeach a defendant if the defendant chooses to testify at trial, regardless of when that silence occurred. This holding is objectionable on two grounds.

First, it impermissibly burdens the right against compelled self-incrimination guaranteed by Art. I, Sec. 8 of the Wisconsin Constitution as repeatedly and consistently interpreted by this court. The majority's stated reasons for doing so fail to adequately justify reducing this right to an empty promise. Furthermore, the rule enunciated by the majority even exceeds the United States Supreme Court's restric-

tions of the scope of the privilege against self-incrimination. Specifically, the majority rule, by encompassing all pre-*Miranda* silence within its ambit, necessarily embraces post-arrest, pre-*Miranda* silence, an area the Supreme Court has not yet addressed.

Second, the majority's holding impermissibly burdens the right to testify in one's own defense, a right guaranteed by both the federal and state constitutions.

I conclude that the state's references to Sorenson's pre-*Miranda* silence are constitutional error. However, I further conclude that these errors were harmless. Accordingly, I concur in the result.

## I. Burdening the Right to Silence

Under the rule announced by the majority today, the right to silence, which this court has repeatedly held attaches at arrest or during police questioning prior to arrest, is diminished nearly to the point of meaninglessness for a defendant who later chooses to testify. It is reduced to near meaninglessness because of the cost involved in asserting the right to silence. Specifically, a defendant's pre-*Miranda* silence may now be used to impeach the defendant at trial if the defendant chooses to testify. In effect, the majority's holding will compel a potential defendant to speak to authorities, prior to receipt of *Miranda* warnings, as to facts that could be crucial in a subsequent prosecution, in order to preserve an exculpatory explanation of events at trial. This is in direct contradiction to Art. I, Sec. 8, which guarantees that the exercise of the right to silence will not be used against the one asserting the right. Thus, the rule announced by the majority reduces a right guaranteed under Art. I, Sec.

8 to a conditional right: a defendant's right to silence will only be protected if the defendant later chooses not to testify at trial.

The privilege against compelled self-incrimination provides that "[n]o person ... may be compelled in any criminal case to be a witness against himself or herself." Article I, Sec. 8, Wis. Const. This privilege has been interpreted to include the right to remain silent and not have the exercise of the privilege used by the prosecution at trial. *State v. Fencl,* 109 Wis. 2d 224, 236, 325 N.W.2d 703 (1982), citing, *State v. Wedgeworth,* 100 Wis. 2d 514, 526, 302 N.W.2d 810 (1981).

While the majority recognizes that post-*Miranda* silence is constitutionally protected at trial under the United States Supreme Court decision of *Doyle v. Ohio,* 426 U.S. 610 (1976), under Wisconsin law there is no basis for limiting the protections of the privilege solely to a testifying defendant's post-*Miranda* silence. This court has acknowledged that an individual's privilege against self-incrimination is not contingent upon receipt of *Miranda* warnings but is a right conferred by the constitution and exists independent of *Miranda. Neely v. State,* 86 Wis. 2d 304, 317–18, 272 N.W.2d 381 (Ct. App. 1978), *aff'd,* 97 Wis. 2d 38, 292 N.W.2d 859 (1980); *Fencl,* 109 Wis. 2d at 237, n. 10. "*Miranda* did not create new rights but, rather, held that the constitutional guarantees already accorded a defendant by the fifth and sixth amendments should be explained to the defendant during a critical stage of the criminal proceeding." *Fencl,* 109 Wis. 2d at 237, n. 10. As recognized in our prior cases, this right attaches during police questioning prior to arrest as well as after arrest and prior to receipt of *Miranda*

warnings. *Fencl,* 109 Wis. 2d 224; *Reichhoff v. State,* 76 Wis. 2d 375, 251 N.W.2d 470 (1977).

Thus, even though our case law has repeatedly and consistently held that the right against self-incrimination includes the right not to have the silence used by the prosecution at trial, and that the right attaches at arrest or during police questioning prior to arrest, independent of *Miranda,* nevertheless the majority's holding substantially curtails this privilege for a defendant who later chooses to testify.

Furthermore, the majority fails to adequately justify this substantial curtailment of a defendant's Art. I, Sec. 8 rights. For example, the majority states that the protections of the privilege against self-incrimination do not attach to a testifying defendant's pre-*Miranda* silence because there has been no governmental inducement of silence, as occurs when a defendant receives *Miranda* warnings. *State v. Sorenson,* No. 86–0124–CR, majority op. at 258. While this is the oft-cited rationale for analyzing a due process violation under the Fourteenth Amendment of the United States Constitution, *see Doyle,* 426 U.S. at 610, it is not a proper justification for denying the protections of a defendant's privilege against self-incrimination.

The majority also reasons that to protect a testifying defendant's pre-*Miranda* silence would, "wrongfully manipulate the rules of evidence, and cripple the state's ability to address all the evidence presented by the defendant at trial." *State v. Sorenson,* No. 86–0124–CR, majority op. at 258. Again, our prior cases call into question the validity of this proposition. Specifically, in *Reichhoff,* we stated that a defendant's silence may just as well indicate his or her reliance on the right to remain silent as it suggests the inference that the defendant's trial testimony is a later fabrica-

tion. *Reichhoff,* 76 Wis. 2d at 383. Thus, given the questionable probative value of the defendant's silence, I fail to see how a constitutional bar on the use of a testifying defendant's pre-trial silence will "cripple" the state's ability to address the evidence.

Further, the majority's reliance on the United States Supreme Court's decision of *Raffel v. United States,* 271 U.S. 494 (1926), does not convince me that the subordination of constitutional rights to evidentiary concerns is warranted under these circumstances. In *Raffel,* the Supreme Court held that the Fifth Amendment is not violated when a defendant who testifies in a retrial is impeached with his prior silence during the first trial. *Id.* This decision has been significantly undermined by subsequent United States Supreme Court decisions such as *Miranda v. Arizona,* 384 U.S. 436, 468 n. 37 (1966), and other landmark cases in which the Supreme Court has barred the use of a defendant's pre-trial silence on fifth amendment grounds.[1] *See also Griffin v. California,* 380 U.S. 609 (1965) (where the Supreme Court held that the Constitution prohibits the government from burdening the right not to incriminate oneself by penalizing silence).

The majority asserts that the denial of a defendant's Art. I, Sec. 8 protections is compensated by the

---

[1]While the United States Supreme Court similarly chose to rely on the rationale of *Raffel* as a justification for permitting a testifying defendant's impeachment with his or her pre-arrest silence in *Jenkins v. Anderson,* 447 U.S. 231, (1980), this reliance was sharply criticized by both the dissent and concurrence in that opinion. As the dissent stated, "our subsequent cases, without expressly overruling it [*Raffel*], limited it so severely as to appear to rob it of any continued vitality until its resurrection today .... The logical underpinnings of *Raffel* were cut away almost completely by *Griffin v. California,* 380 U.S. 609 (1965)." *Jenkins,* 447 U.S. at 252 (Marshall, J., dissenting) (1980).

fact that a testifying defendant, who is impeached with his pre-*Miranda* silence, has the opportunity to explain such silence on redirect. The majority overlooks the point that an accused has both the right to testify in his own defense, as well as the right to refuse to incriminate himself prior to trial, neither of which should be curtailed absent a compelling justification.

Finally, the majority's interpretation of the federal and state constitutional privilege against compelled self-incrimination exceeds the Supreme Court's own statements on the scope of the privilege. Specifically, in *Jenkins,* the Supreme Court held, in part, that it was not a violation of the fifth amendment to impeach a testifying defendant with his pre-arrest silence. *Jenkins,* 447 U.S. at 238. Subsequently, in *Fletcher v. Weir,* 455 U.S. 603 (1982) (per curiam), the Supreme Court held that it was not a violation of the fourteenth amendment to impeach a testifying defendant with his post-arrest, pre-*Miranda* silence. Thus, the Supreme Court has not yet considered whether the protections of the fifth amendment privilege extend to a defendant's silence after arrest and prior to *Miranda* warnings. Yet, under the majority's holding, any reference to a defendant's post-arrest, pre-*Miranda* silence is permissible under Art. I, Sec. 8 of the Wisconsin Constitution and the fifth amendment to the U.S. Constitution.

The United States Supreme Court, when directly faced with the issue of whether the fifth amendment privilege attaches to post-arrest, pre-*Miranda* silence, may well decide that the privilege and all its corollaries including the right not to have the silence used in any manner by the prosecution, attach to that silence. We are far better to stay with our well developed, well reasoned case law than to follow what we "think" the

Supreme Court will do. It might turn out we are following a phantom.

Moreover, should the Supreme Court in the future decide that the fifth amendment privilege does not protect post-arrest, pre-*Miranda* silence, we are not required to follow them in construing Art. I, Sec. 8 of the Wisconsin Constitution, and should not do so in light of our previous interpretation of the scope of the privilege against compelled self-incrimination. *E.g., Fencl,* 109 Wis. 2d at 236; *Reichoff,* 76 Wis. 2d at 378. As we stated in *State v. Doe,* 78 Wis. 2d 161, 254 N.W.2d 210 (1977),

> "This court has demonstrated that it will not be bound by the minimums which are imposed by the Supreme Court of the United States if it is the judgment of this court that the Constitution of Wisconsin and the laws of this state require that greater protection of citizens' liberties ought to be afforded." *Id.* at 172.

## II. Burdening of the Right to Testify.

The majority's holding also infringes upon a defendant's constitutional right to testify in his or her own defense by burdening the exercise of this right. Because the prosecution may impeach a defendant with his or her pre-*Miranda* silence once the defendant chooses to take the stand, the defendant at trial must decide whether to testify, in which event his or her silence will be used by prosecution to impeach, or not testify. The majority has presented the defendant with a Hobson's choice at trial which perverts the right to testify in one's own defense guaranteed to all of us by the federal and state constitutions. As the United States Supreme Court has noted in the related

context of comment on a defendant's choice not to testify at trial, "[i]t is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." *Griffin v. California,* 380 U.S. at 614.

## III. Conclusion

The majority rule takes a fundamental right, the right to silence, and transforms it into a conditional right. Thus, the right not to have silence used at trial exists on the condition that the individual asserting the right does not testify. This consequence of the majority's rule is made even more egregious by the fact that the condition is unstated and, therefore, known only to the most sophisticated. Most persons when arrested or questioned by the police prior to arrest, will not have the benefit of counsel and, consequently, will be ignorant of the effect of their silence on a subsequent decision to testify at trial. As stated by the dissent in the United States Supreme Court decision of *Jenkins,*

"This means that a person who thinks he may have done something wrong must immediately decide, most likely without the assistance of counsel, whether, if he is ever charged with an offense and brought to trial, he may wish to take the stand. For if he may later want to take the stand, he had better go to the police station right away to preserve his exculpatory explanation of the events—even though in so doing he must incriminate himself and provide evidence which may be crucial in his eventual conviction. But if he decides not to incriminate himself, he may anticipate that his right to testify in his own defense will be undermined by the argument that his story is

probably untrue because he did not volunteer it to the police at the earliest opportunity." *Jenkins,* 447 U.S. at 253 (Marshall, J., dissenting).

For the foregoing reasons, I conclude that the majority errs in holding that references to a testifying defendant's pre-*Miranda* silence do not violate the privilege against compelled self-incrimination under Art. I, Sec. 8 of the Wisconsin Constitution. A defendant's pre-*Miranda* silence at arrest or during police questioning prior to arrest, should be constitutionally protected to the same degree as a defendant's post-*Miranda* silence when the defendant elects to take the stand. Accordingly, I conclude that any reference to a testifying defendant's silence at arrest or during police questioning prior to arrest, and prior to receipt of *Miranda* warnings, is constitutional error. In the present case, however, there is no reasonable possibility that the error contributed to Sorenson's conviction; the references to Sorenson's pre-*Miranda* silence were infrequent, and the strength of the state's evidence against him was substantial. *State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985); *Chapman v. California,* 386 U.S. 18 (1967).

I am authorized to state that CHIEF JUSTICE NATHAN HEFFERNAN joins in this concurrence.