CITY OF MENOMONIE, Plaintiff-Appellant,

v.

EVENSEN DODGE, INC., f/k/a T.G. Evensen & Associates, Inc., a Minnesota corporation, Defendant-Third Party Plaintiff,

QUARLES & BRADY, a Wisconsin Legal Partnership, Defendant-Respondent,

v.

MARSHALL & ILSLEY TRUST COMPANY, a/k/a M&I Marshall & Ilsley Bank, Third Party Defendant.

Court of Appeals

*No. 90-2176. Submitted on briefs March 19, 1991.—Decided April 16, 1991.*

(Also reported in 471 N.W.2d 513.)

228

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jeffrey F. Shaw* and *Margo L. Coyle* of *Briggs and Morgan* of St. Paul, Minnesota.

On behalf of the defendant-respondent, the cause was submitted on the brief of *John W. Hein* of *Gibbs, Roper, Loots & Williams, S.C.* of Milwaukee.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. The city of Menomonie and the various defendants in this case stipulated to damages in the amount of $237,134.75 for negligence and breach of fiduciary duty in the administration of a trust fund established for the purpose of refunding the city's outstanding bonds. Prior to trial, Marshall & Ilsley Trust Company (M&I), the trustee, settled with the city, and both parties signed a *Pierringer* release.[1] The key issue on appeal is whether a negligent tortfeasor who executes a *Pierringer* release has any liability in indemnity to a nonsettling negligent tortfeasor that can be imputed to the

---

[1] *Pierringer v. Hoger*, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

settling plaintiff. We conclude there is no such liability and therefore reverse that part of the judgment dismissing the city's claims against Quarles & Brady (Q& B), a nonsettling defendant.

We further conclude that documentary evidence of the profit M&I made on the use of the city's uninvested trust funds was admissible under either secs. 908.03(24) or 910.06, Stats. Finally, we hold that the statute of limitations did not bar the city's claim against Q&B. We therefore affirm the jury's verdict that assigned 15% causal negligence to Q&B.

The city contracted with M&I (as trustee), Evensen Dodge, Inc. (as fiscal consultant), and Q&B (as legal counsel) to assist in structuring a program for refunding its outstanding debt. The program called for the establishment of a trust fund to contain the proceeds of the sale of $3.5 million in refunding bonds. Of particular importance in this litigation are the 1970 and 1975 bond issues that became subject to call in 1981 and 1985, respectively. Because the wrong schedules were attached to the trust agreement, trust funds were not used to call the 1970 and 1975 bonds. The funds planned for this purpose were held uninvested in trust.

Following a trial, the jury apportioned causal negligence as follows: 51% to M&I, 25% to Evensen, 15% to Q&B and 9% to the city itself. In addition, the jury answered the following verdict questions:

> Did the Marshall & Ilsley Trust Company a/k/a Marshall & Ilsley Bank breach its duty as a trustee of the trust established in connection with the refunding of the City of Menomonie's outstanding corporate purpose obligations?
> ANSWER: Yes.

What profit or economic benefit, if any, did Marshall & Ilsley Trust Company a/k/a Marshall & Ilsley Bank derive from uninvested trust funds? $252,065.93.

The trial court adopted the jury's finding of profit or economic benefit derived by M&I.[2] The court concluded that M&I "is accountable for and had a duty to disgorge" that amount and "Q&B would be entitled to indemnification from the M&I in an amount not less than: 1) the amount of loss sustained by the Trust resulting from the M&I's breach of trust; or 2) the profit made by the Trustee through the breach of trust, whichever is greater." Because the court concluded that Q&B's indemnity claim against M&I was imputed to the city by virtue of the *Pierringer* release, it dismissed the city's claim against Q&B.

■

Whether a negligent tortfeasor has a right to indemnity from a negligent joint tortfeasor is a question of law, which we review de novo. *See Fleming v. Threshermen's Mut. Ins. Co.,* 131 Wis. 2d 123, 127, 388 N.W.2d 908, 909 (1986) (whether a negligent tortfeasor has a right to indemnity from an intentional joint tortfeasor and whether a *Pierringer* release of an intentional joint tortfeasor affects the rights of a negligent tortfeasor are questions of law).

■

A *Pierringer* release operates to impute to the settling plaintiff whatever liability in contribution or indemnity the settling defendant may have to the non-settling defendants and to bar subsequent contribution

---

[2]The trial court made a slight modification to the jury's calculation of profit, which the parties do not dispute and which does not affect the result.

or indemnity actions against the settling defendants. *Fleming,* 131 Wis. 2d at 131, 388 N.W.2d at 911. With respect to a claim for contribution, the plaintiff agrees that the amount paid for the release will satisfy whatever percentage of causal negligence is ultimately assigned to a settling defendant. *Imark Indus. v. Arthur Young & Co.,* 148 Wis. 2d 605, 620-21, 436 N.W.2d 311, 317-18 (1989). Wisconsin law recognizes that a negligent tortfeasor has a claim for indemnity against an intentional joint tortfeasor, and liability to indemnify is imputed to a settling plaintiff. *Fleming,* 131 Wis. 2d at 131, 388 N.W.2d at 911.

■ The essential difference between a claim for indemnity and one for contribution has been described as follows:

> Contribution distributes the loss by requiring each person to pay his proportionate share of the damages on a comparative fault basis. Indemnification shifts the entire loss from one person who has been compelled to pay it to another who on the basis of equitable principles should bear the loss.

*Swanigan v. State Farm Ins. Co.,* 99 Wis. 2d 179, 196, 299 N.W.2d 234, 242 (1980) (citation omitted).

Q&B contends here that it had a claim against M&I for indemnity rather than contribution when M&I signed the *Pierringer* release, and so it retains that claim against the city. The claim for indemnity, in its view, is based on M&I's responsibility to disgorge profits that exceeded the damage caused by negligence or breach of trust.[3] Had M&I been compelled to disgorge these profits, the city would have suffered no damage. Q&B urges

---

[3]We do not decide whether M&I had a duty to disgorge profits under these facts.

an extension of the *Fleming* rule to permit a claim for indemnity by one negligent tortfeasor where a plaintiff could recover an amount in excess of any damage by pursuing an action against another negligent tortfeasor. We reject Q&B's proposed extension of *Fleming.*

While important issues of public policy support a determination that a negligent tortfeasor has a claim for indemnity against an intentional tortfeasor, *see Fleming,* the concept of an indemnity action between negligent tortfeasors is increasingly disfavored. As one commentator notes:

> It was traditionally thought that under "indemnity" the loss is shifted entirely to a party whose fault was substantially greater than that of the indemnitee, whereas in "contribution" the loss is apportioned . . ..
>
> . . . the underlying network of doctrinal assumptions has begun to unravel. As courts have begun to abandon their reluctance to apportion fault among negligent actors, it is no longer universally assumed that all negligent actors are *in pari delicto.* Even where they are, it no longer seems so clear that a defendant's position should be deemed the superior one, in the sense that courts need be deemed helpless to effect a shift of loss by way of apportionment. Accordingly, courts have begun to *apportion among the negligent,* not only between plaintiffs and defendants in comparative negligence . . . but also among negligent defendants . . .. *[I]n states where the contribution action has become well developed, the ability to apportion that it offers makes it more adaptable to complex situations than the all-or-nothing choice of traditional indemnity. There is accordingly a tendency in these jurisdictions for "contribution" to supplant "indemnity."* By whatever route, the remedies of contribution and indemnity may merge

in jurisdictions where these developments are occurring.

3 F. Harper, F. James & O. Gray, *The Law of Torts,* sec. 10.2 n.57 (2d ed. 1986) (emphasis added).

■

Our supreme court has recognized that negligent tortfeasors have claims for contribution, not indemnity: "[T]he rule allowing contribution should be followed when the conduct of the defendants is not willful or conscious." *Fleming,* 131 Wis. 2d at 129, 388 N.W.2d at 910. Here, neither the jury nor the trial court found that M&I was liable for an intentional tort. There was no finding that M&I's conduct was willful or conscious. Moreover, the jury made a determination of each negligent tortfeasor's relative liability for the damage caused the city. It is just such an apportionment of responsibility among the negligent that is sought in a contribution action.

■

Presuming that the city could have recovered M&I's profit on the uninvested trust funds, it surrendered that right when it entered into the *Pierringer* release. The city assumed the risk that a larger amount could have been recovered from M&I at trial. We conclude that M&I's only liability to Q&B that can be imputed to the city by virtue of the *Pierringer* release is one in contribution. The jury's determination that Q&B is responsible for 15% of the city's damages should stand.

Next, the city argues that documentary evidence of the profit M&I made on the use of the city's uninvested trust funds was inadmissible.[4] This documentary evi-

---

[4]As the city points out, this evidence can be seen as relevant to two issues: the total profit realized by M&I on the uninvested trust funds, and the total percentage of negligence assigned to M&

dence was introduced during the testimony of Frank Pierson, a vice-president with M&I, who was manager of the corporate trust department from 1985 until sometime in 1988. The document was made up of two parts. The first part was entitled "Analysis of Equivalent Income Benefit Derived from Principal & Interest Cash Balances Resulting From Receipt of $838,552.50 on 3/10/81 and $915,640.00 on 11/25/85" and was clearly marked "FOR INTERNAL USE ONLY." It was prepared at Pierson's direction in 1987 or early 1988. The second part was an undated cover letter addressed "TO WHOM IT MAY CONCERN" describing the attached document and the sources Pierson used in preparing it.[5] Pierson testified that the first part was prepared "when we became aware that there was potential litigation." However, at trial another M&I vice-president described a schedule of anticipated cash receipts and disbursements prepared in 1976 when setting up the city's trust, with supporting documentation that included a handwritten analysis of the anticipated economic benefit to M&I from cash balances in the account, similar to that drawn up at Pierson's direction in 1987 or 1988.

---

I. We have determined that M&I had no liability in indemnity to Q&B prior to signing the *Pierringer* release, thus the issue of the total profit it realized is irrelevant. We address the city's contention of evidentiary error, however, because we cannot hold as a matter of law that the jury's assignment of percentages of negligence was unaffected by knowledge of the profit M&I realized.

[5]Because the second part of the document, the letter addressed "TO WHOM IT MAY CONCERN," was cumulative to Pierson's trial testimony (received without objection) as to the purpose of preparing the analysis, we do not address its admissibility separately.

The trial court's decision concerning the admissibility of evidence rests within its sound discretion. *State v. Buelow,* 122 Wis. 2d 465, 476, 363 N.W.2d 255, 261 (Ct. App. 1984). This discretionary determination will not be reversed unless it is abused or based upon an erroneous view of the law. *Id.*

We conclude that there are two independent grounds upon which to base a decision to admit this evidence. First, sec. 908.03(24), Stats., provides that "a [hearsay] statement not specifically covered by any of the foregoing exceptions but having circumstantial guarantees of trustworthiness" can be admissible. *See State v. Sorenson,* 143 Wis. 2d 226, 242, 421 N.W.2d 77, 83 (1988) (residual hearsay exception permits admission of hearsay evidence, not specifically enumerated in other exceptions, that possesses comparable circumstantial guarantees of trustworthiness).

Here, the underlying analysis admitted at trial was prepared at the direction of the manager of the corporate trust department. While the schedule was prepared after the trustee had become aware of potential litigation, it was similar to another analysis prepared when the trust was set up. The trial court could infer that *expected* profit from uninvested trust funds is part of a standard analysis of anticipated trust receipts and disbursements that aids the trustee in determining appropriate fees to be charged for trust management. A *retroactive* analysis of profit actually received from uninvested trust funds is similarly prepared. M&I customarily relies on the accuracy of prospective analyses of this sort, and so a retroactive analysis would have a strong indicia of trustworthiness when prepared by trust department employees.

236

Additionally, the analysis was clearly marked for internal use and did not appear to be prepared to better M&I's position in any upcoming litigation. It was meant to assist M&I in determining when and for how much to settle, rather than as part of an attempt to "create" evidence for trial. This serves as a second indicia of trustworthiness.

A third indicia of trustworthiness is found in the manner in which Q&B obtained the M&I analysis. In December 1988, Q&B served interrogatories on M&I. In February 1989, the city and M&I signed the *Pierringer* release. Q&B refused to stipulate to M&I's dismissal until it received a response to its interrogatories. In July, Q&B filed a motion to compel M&I to respond to its interrogatories. It is only after this motion was filed that M&I provided Q&B with the document. There is no indication that a settling defendant (M&I) conspired with a nonsettling defendant (Q&B) to provide documentation that would cause a jury to find the settling defendant (M&I) more negligent, thus reducing the nonsettling defendant's (Q&B's) proportional share of negligence. We conclude that the trial court did not abuse its discretion by admitting M&I's analysis of economic benefit accruing to it from uninvested trust funds.

As an alternative ground for our ruling, we hold that this evidence is also admissible as a summary or compilation. Section 910.06, Stats., provides:

> The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and

place. The judge may order that they be produced in court.

The disputed documentary evidence was a schedule with attached source material. For each transaction date, the schedule showed the transaction amount, net balance remaining, reserve requirement (12%), net balance after reserves, average federal funds rate, days outstanding and equivalent income benefit.

The city argues that the profit analysis is not admissible as a summary because originals or copies of the underlying documentation were not made available prior to trial. We reject this contention. The record discloses that this case went to trial in April 1990. As early as October 24, 1989, Q&B filed an affidavit in support of a pretrial motion that included as an attachment the entire disputed documentary evidence.

Pierson's cover letter identified the sources used in preparation of the analysis as "the schedules contained in the Trust Agreement with respect to dates and amounts of principal and interest payments and the value tables of The Bloomberg attached hereto with respect to the average Federal Funds Rate." There is no dispute that each party had copies of the trust agreement with attached schedules. The Bloomberg tables used, reflecting applicable federal funds rate, were appended to the analysis.[6] We conclude that the trial court did not abuse its discretion when it admitted this disputed documentation as a summary of transactions in the city's trust fund account which resulted in an economic benefit to M&I.[7]

---

[6]The city does not contend that the trust agreement or the Bloomberg tables were not independently admissible.

[7]Because we conclude that this evidence is admissible under either sec. 908.03(6) or sec. 910.06, Stats., we do not address Q&

Q&B argues, as an alternative ground for upholding the trial court's dismissal of the city's claims against it, that the statute of limitations had expired prior to commencement of this action. The applicable statute of limitations is sec. 893.53, Stats., which allows commencement of certain actions six years after the cause of action accrues. This statute applies to legal malpractice actions. *Acharya v. Carroll,* 152 Wis. 2d 330, 337–38, 448 N.W.2d 275, 279 (Ct. App. 1989).

Tort claims accrue on the date the injury is discovered or with reasonable diligence should have been discovered, whichever occurs first. *Hansen v. A.H. Robins Co.,* 113 Wis. 2d 550, 560, 335 N.W.2d 578, 583 (1983). The trial court did not detail its analysis in rejecting Q&B's statute of limitations defense. The facts here are undisputed, however, so the determination that a given date is the date of "discovery" within the meaning of the *Hansen* rule is a matter of law that we review de novo. *Borello v. United States Oil Co.,* 130 Wis. 2d 397, 404, 388 N.W.2d 140, 143 (1986).

The complaint in this action was filed October 26, 1987. In its brief, Q&B begins its argument entitled "THE TRUSTEE'S CONDUCT FOLLOWING *DISCOVERY OF THE ERROR*" with the sentence "In April, 1987, the City's auditors questioned why no revenue was credited to the Trust account during 1986." (Emphasis added.) The brief points to only one date prior to April 1987, where it contends the city knew or should have known of its injury. While Q&B concedes that the schedules showing investments and payouts were not attached at the time the city signed the trust agreement, it contends that the city should have

B's contention that it was also admissible as a party admission or as a business record.

reviewed the transcript of the bond proceedings when Q&B delivered that transcript to the city in 1976. Had it done so, Q&B argues, it would have discovered that the wrong schedules were attached to the trust agreement.

■■■

The parties do not dispute that the city engaged three experts—a fiscal consultant, a trustee and a law firm—to assist in setting up this refunding arrangement. They do not dispute that the parties signed a trust agreement without any schedules attached. At a later date, some party[8] attached the wrong schedules. We reject the contention that, acting with reasonable diligence, the city should have discovered its injury prior to October 1981. We conclude that the trial court did not err in its determination that the city filed this action within six years from the date on which its cause of action accrued.

In summary, the court's judgment dismissing Q&B is reversed and the matter is remanded with directions to grant judgment on the verdict. We also reject the city's argument that the court erroneously admitted documentary evidence. Finally, we reject the argument that the statute of limitations bars the city's action against Q&B.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded. No costs to either party.

■■■■■

---

[8]Q&B contends that the wrong schedules were attached "[f]or reasons not explained in the record." It does not contend, however, that the city was in any way responsible for attaching the schedules to the agreement.