STATE of Wisconsin, Plaintiff-Respondent,

v.

Liliana PETROVIC, Defendant-Appellant.†

Court of Appeals

*No. 97–3403–CR. Submitted on briefs September 25, 1998.—Decided January 20, 1999.*

(Also reported in 592 N.W.2d 238.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert B. Rondini* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Marguerite M. Moeller*, assistant attorney general.

Before Snyder, P.J., Brown and Nettesheim, JJ.

SNYDER, P.J. Liliana Petrovic appeals a conviction on one count of manufacturing a controlled substance contrary to § 161.41(1)(h)2, STATS., 1993–94.[1] Petrovic contends that the trial court erred in admitting incriminating hearsay statements from her daughter and evidence of Petrovic's affiliation with the "Outlaws" motorcycle gang. Petrovic also charges that her trial counsel was ineffective because he elicited and failed to object to testimony that she had invoked her Fifth Amendment right to remain silent.

---

[1] This section has been renumbered as § 961.41(1)(h)2, STATS.

We are satisfied that the trial court properly admitted the hearsay statements under the residual hearsay exception and appropriately found Petrovic's counsel not to be ineffective. Although we determine that the court erred in admitting evidence suggesting Petrovic's association with the Outlaws, we conclude that this error was harmless.

## FACTS

On September 30, 1994, the Waukesha County Metropolitan Drug Unit executed a search warrant on Petrovic's home and surrounding property. During the search, Petrovic's five-year-old daughter, Tanya, gave the police information about marijuana plants her mother was growing outside. This information led to the discovery of thirty-nine marijuana plants. Based on the results of the search, the State charged Petrovic with one count of unlawful manufacture of tetrahydrocannabinols (THC) contrary to §§ 161.41(1)(h)2 and 161.14(4)(t), STATS., 1993–94,[2] and possession of a Schedule I controlled substance without a tax stamp contrary to §§ 139.88 and 139.95(2), STATS., 1993–94.[3]

Prior to trial, the court determined that Tanya was unavailable as a witness due to a lack of memory and mental infirmity because of her age. *See* § 908.04(1)(c), (d), STATS. The court, however, permitted the State to

---

[2] Section 161.14(4)(t), STATS., 1993–94, has been renumbered as § 961.14(4)(t), STATS.

[3] Petrovic was also charged with maintaining a dwelling for the purpose of manufacturing, keeping or delivering controlled substances contrary to § 161.42, STATS., 1993–94 (this section has been renumbered as § 961.42, STATS.), which was later dismissed, and with possession of a firearm by a convicted felon contrary to § 941.29(2), STATS., which was later dropped by the State.

present hearsay evidence of the statements Tanya had made to Detective Gregory Heyrman during the search. The court ruled that Tanya's remarks were admissible under the excited utterance doctrine and the residual exception to the hearsay rule. At trial, Heyrman testified that during the search of Petrovic's home, he interviewed Tanya and her grandmother. According to Heyrman, Tanya was "[v]ery inquisitive, talkative, very alert, seemed to be a very intelligent little girl" and "did not appear . . . to be scared or upset." When Heyrman inquired about whether marijuana was being grown, Tanya provided specific details about her mother's plants, including how the plants were grown and where they were located on the property. Heyrman then used this information to find Petrovic's plot of marijuana.

In addition to Tanya's statements, the court permitted the State to introduce evidence of Petrovic's affiliation with the Outlaws motorcycle gang. This evidence included two buttons with Outlaws logos on them and photo albums allegedly containing photographs of members of the Outlaws. There was also testimony from Detective Michael Spang stating that Petrovic had associated with Jack Fooden, who Spang stated he knew from prior drug investigations.

The jury found Petrovic guilty of manufacturing a controlled substance and violating the drug tax stamp law.[4] Petrovic now appeals.

---

[4] The tax stamp law violation was vacated on February 20, 1997, consistent with *State v. Hall,* 207 Wis. 2d 54, 557 N.W.2d 778 (1997) (declaring the drug tax stamp law unconstitutional).

## A. Hearsay Evidence

Petrovic first contends that the trial court erred in allowing Heyrman's testimony describing his interview with Tanya because the testimony involved inadmissible hearsay and violated Petrovic's right to confrontation. The State responds that Tanya's out-of-court statements were properly admitted under the residual hearsay exception, § 908.045(6), STATS., and that the admission of the statements did not violate Petrovic's right to confrontation. We are satisfied that the hearsay testimony was properly admitted under the residual exception.[5]

The admission or exclusion of evidence is a discretionary determination of the trial court and will be upheld absent any misuse of that discretion. *See State v. Patino*, 177 Wis. 2d 348, 362, 502 N.W.2d 601, 606 (Ct. App. 1993). If the trial court's decision is supported by the record, we will not reverse even though the court may have given the wrong reason or no reason at all. *See id.*

The residual hearsay exception permits admission of hearsay evidence, not specifically addressed in the other exceptions, which contains "comparable circumstantial guarantees of trustworthiness." Section 908.045(6), STATS.; *see State v. Sorenson*, 143 Wis. 2d 226, 242, 421 N.W.2d 77, 83 (1988). The residual exception should only be applied to the "novel or unanticipated category of hearsay that does not fall

---

[5] Petrovic argues and the State concedes that the trial court erred in ruling that the excited utterance exception, § 908.03(2), STATS., also permitted the admission of Tanya's hearsay statements. We agree.

under one of the named categories." *State v. Stevens*, 171 Wis. 2d 106, 120, 490 N.W.2d 753, 760 (Ct. App. 1992). The use of the exception is "governed by the circumstances *surrounding the making of the hearsay statement." Id.*

The State suggests that forcing a young girl to testify against her own mother in criminal court is the sort of novel and unanticipated situation in which the residual hearsay exception should apply. In other words, rather than forcing a five-year-old to testify against her mother, the question should be whether her out-of-court testimony is trustworthy. We agree. However, before we can consider the trustworthiness of Tanya's hearsay statements, we must address the merits of excusing her live trial testimony.

In *Sorenson*, our supreme court addressed the admission of out-of-court statements made by young sexual assault victims and established five factors to consider in determining the admissibility of their statements under the residual hearsay exception. *See Sorenson*, 143 Wis. 2d at 245–46, 421 N.W.2d at 84–85. While the State concedes that *Sorenson* does not specifically address the statements of nonvictim child witnesses, it argues that the *Sorenson* factors are relevant and applicable here. Petrovic disagrees because Tanya is not a child sexual assault victim and because we declined to apply the *Sorenson* factors to a nonvictim child witness in *Stevens*, a burglary case.

In *Stevens*, the defendant was charged with burglarizing stereo equipment. Stevens allegedly admitted the burglary to his thirteen-year-old stepdaughter, Melissa, who repeated the admission to her best friend in September 1991. Melissa died prior to Stevens' burglary trial in December 1991, and the State sought to introduce Stevens' admission to

485

Melissa through the testimony of her friend. *See Stevens*, 171 Wis. 2d at 121, 490 N.W.2d at 760. We held that the *Sorenson* factors were not applicable in *Stevens* because: (1) it was not a case involving "psychological scarring attached to forcing the young child to testify about sexual assault"; (2) there were "no exigencies similar to [forced sexual assault testimony] psychological scarring compelling the admission" of the hearsay statement; (3) "a thirteen-year-old girl could know about a burglary from sources other than her stepfather"; and (4) "a teenager similarly could have motivation to falsely accuse her stepfather."[6] *Id.*

Like Melissa's friend in *Stevens*, Tanya is not a victim child witness. We conclude, however, that forcing Tanya to testify against her mother in criminal court is an exigency sufficiently similar to forcing a child sexual assault victim to testify, and that the exigency would allow the admission of Tanya's statements under the residual hearsay exception. Because Tanya's out-of-court statements are permissible residual hearsay evidence, we now turn to whether the statements contain the requisite guarantees of trustworthiness. We do so by applying the five *Sorenson* factors.

The first factor concerns Tanya's personal attributes. Heyrman testified that Tanya "appeared to be a 5 year old little girl that just wanted to talk, was very bright, outgoing, and the police were at her house and she was going to tell them what she knew." Heyrman also testified that Tanya was "a very intelligent little girl" who "did not appear . . . to be scared or upset" when Heyrman first spoke with her. When Heyrman inquired about marijuana, Tanya comprehended Heyrman's inquiry and responded that her mother had

---

[6] The third and fourth considerations in the *Stevens* analysis are not relevant to this case.

been growing plants outside. Heyrman confessed that Tanya "was teaching [him] things about marijuana plants," including the fact that female plants carried seeds and were more desirable than male plants.

The second factor concerns Heyrman being the recipient of Tanya's statements. There is no evidence that Heyrman, while admittedly a police officer in Tanya's home at the time of the statements, coerced or manipulated her into presenting the information she gave him. That Heyrman and Tanya had a potentially adverse relationship does not, by itself, negatively impact upon the trustworthiness of her statements or support any motivation on his part to fabricate or distort the contents.

Third, as to the circumstances of Tanya's statements, her exchange with Heyrman was prompted by him and thus was not "spontaneous," but we are convinced that Tanya had no motive to fabricate a story that would incriminate her mother. There was no testimony that Tanya had any reason to harm her mother. In fact, there is no indication that Tanya even knew that the plants her mother was growing were illegal. Tanya was proud of her mother's plants and credited her mother with having taught her about them.

Under factor four, we consider the content of the statements themselves. Heyrman reported his conversation with Tanya as follows:

> I asked her to tell me about the plants. She told me that her mother really liked these plants, that she watered them almost every day. She said that her mother liked nature. I asked her if the plants had ever been in the house. She said no, but they used to be next to the house in small cups when they were planted as seeds, and that they were under the eave[s] of the house so they wouldn't get too much

rain. She told me that if they got too much rain that they would die, and they were put along the house as to protect them from the rains.

. . . I asked her where the plants were . . . [and] she told me that they were planted out back by the pond where the geese are.

She then went on to tell me that the plants . . . were made up of male plants and female plants, that the female plants had seeds and they were the good plants and that the male plants were the bad plants. She explained that her mother had gotten the seeds mixed up when she planted them and therefore there were, as she put it, boy plants and girl plants growing together. She kind of laughed and said that her mother had gotten seeds all mixed up. She also told me that these plants had buds on them.

The content of the statements fails to disclose any sign of deceit or falsity but, rather, reveals a knowledge of matters that would ordinarily be attributable to an attentive five-year-old.

As to the fifth factor in *Sorenson,* Tanya's statements were immediately corroborated by Heyrman's finding of physical evidence in the places she said they were located. Her statements were confirmed by and consistent with the facts. In context, Tanya's statements provided assistance to the police officers in executing the search warrant rather than disclosing that which was already addressed in the warrant.

We are satisfied that Tanya's testimony incriminating her mother at a later trial would present an exigency similar to the psychological scarring of a child victim, that Tanya acted voluntarily and without a motive to lie in providing the evidence, and that Tanya's statements to Heyrman had the requisite cir-

cumstantial guarantees of trustworthiness pursuant to § 908.045(6), Stats.

■ Our next consideration is the Confrontation Clause. *See State v. Lomprey*, 173 Wis. 2d 209, 218, 496 N.W.2d 172, 176 (Ct. App. 1992). The Sixth Amendment of the United States Constitution and Article I, Section 7, of the Wisconsin Constitution require that every defendant in a criminal case be given an opportunity to confront his or her accusers. The Confrontation Clause "bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Idaho v. Wright*, 497 U.S. 805, 814 (1990). Where a witness is unavailable, his or her statement is admissible only if it bears adequate "indicia of reliability"; reliability can be inferred if the evidence falls within a firmly rooted hearsay exception. *See id.* at 814–15. However, where the residual hearsay exception has been applied, we look to "a showing of particularized guarantees of trustworthiness" because the residual hearsay exception is not a firmly rooted hearsay exception for Confrontation Clause purposes. *Id.* at 816–17 (quoted source omitted).

The question here is whether Tanya was "particularly likely to be telling the truth when the statement was made." *Id.* at 822. Factors addressing this question include spontaneity and consistent repetition, the child's mental state, use of terminology unexpected of a child of similar age and a lack of motive to fabricate. *See id.* at 821–22. These factors, recognized by the Supreme Court in the context of a child sexual assault case, are not exclusive and a court may use its discretion in determining what factors are most appropriate. *See id.* at 822. In addition to these factors, the evidence "must possess indicia of reliability by virtue of its

inherent truthworthiness, not by reference to other evidence at trial." *Id.*

Consistent with *Wright*, we look to the record for the circumstances under which Tanya's statements were made to determine whether the presumption that the statements lack reliability has been rebutted. *See Lomprey*, 173 Wis. 2d at 219, 496 N.W.2d at 176. The most telling of the *Wright* factors for purposes of this case is motivation to lie. As we have already determined, there is no indication that Tanya had any reason to provide incriminating information to the police that would be harmful to her mother. The evidence reveals that she was simply attempting to be helpful. As to Tanya's mental state, Heyrman described her as "alert," "very bright" and "very talkative." The information Tanya provided about her mother's plants was straightforward, consistent and later confirmed by Heyrman. Although Tanya's statements were not spontaneous, consistently repeated, or presented in terminology unexpected of a child her age, we conclude that these factors carry little weight under the present circumstances. Consequently, we are satisfied that Petrovic's right to confront the witness was not abrogated.

### B. Admissibility of Outlaws Evidence

Petrovic contends that the trial court improperly admitted testimony indicating that she associated with the Outlaws motorcycle gang and Fooden, who the State indicated had been involved in drug dealing. On the morning of trial, Petrovic moved the court to preclude this evidence because it had no relevance to the issue of the manufacture of marijuana. The State countered that the evidence was admissible because it

related to the issue of drug delivery and distribution. Ultimately, the court denied Petrovic's motion in limine:

> While there may be some prejudice in attempting to associate the defendant with the Outlaw[s] motorcycle gang, they seem to have a bad reputation in this community. On the other hand, the state is entitled to attempt, as long as they have some reasonable basis and proof to do so, to link her to someone else or some group or some persons who may be interested in buying or receiving marijuana that she manufactures. That doesn't mean the state has carte blanche to try to paint her as an Outlaw; that means the state can introduce evidence about Outlaws as long as it's directly related to some proof they have showing who she's associated with that uses or might want to buy marijuana or is involved in drug trade.
>
> Presumably that would have to be particularized, because I can't imagine the state has any proof that everyone who's a member of–calls themselves a member of the Outlaw[s] motorcycle gang is a drug criminal. So it would have to be particularized in some way.

During trial, Police Officers Chris Jaekl and John Gibbs presented evidence suggesting Petrovic's connection with the Outlaws gang. Two Outlaws buttons were found in a bedroom in Petrovic's house. According to Jaekl, "[o]ne of them shows a male and a female next to an American flag, and the male has a shirt on which says Outlaws. And there is another button which has the logo Outlaws, Milwaukee, and then a skull and crossbones on it." Gibbs testified that two photo albums were found in which it "appear[ed that] some of the photos . . . would be of Outlaw[s] motorcycle members."

491

Evidence was also introduced indicating that Petrovic was "closely associated" with Fooden. During motion hearings before trial, the prosecutor stated that Petrovic had admitted that Fooden was a member of the Outlaws. At trial, however, no evidence was presented directly connecting Fooden with the Outlaws. Agent Spang stated that he had "extensive experience investigating certain members of different motorcycle clubs in [the] Milwaukee, Waukesha area for years, and [that he had] known of Mr. Fooden almost [his] whole career." Spang also indicated that he was familiar with Fooden based on drug investigations he had performed for the IRS. Spang mentioned that Fooden's financial records were found at Petrovic's house because, according to Petrovic, she "helped Mr. Fooden with his personal financial matters." Spang testified that Petrovic had denied that Fooden was involved with growing marijuana plants.[7]

The State asserts that given Petrovic's defense that she was ignorant of the plants, evidence indicating Petrovic's affiliation with the Outlaws and Fooden was relevant in order to "show that she had a potential source for distributing the marijuana grown at her residence." The State admits that the "Outlaws buttons and photograph albums were, standing alone, of little probative value." However, the State argues that "in conjunction with the evidence relating to Fooden, this physical evidence tended to show that the defendant

---

[7] Although Petrovic's counsel did not object during trial to the State's presentation of evidence relating to the Outlaws and Jack Fooden, Petrovic did not waive this issue on appeal. *See State v. Bergeron,* 162 Wis. 2d 521, 528, 470 N.W.2d 322, 324 (Ct. App. 1991) ("A defendant who has raised a motion *in limine* generally preserves the right to appeal on the issue raised by the motion without also objecting at trial.").

had ties to a group through which the marijuana grown on her property could be distributed."

■

To be admissible at trial, evidence must be relevant. *See* § 904.02, STATS. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Section 904.01, STATS. Even if evidence is relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* § 904.03, STATS. Whether to admit evidence is a matter within the trial court's discretion. *See State v. Evans*, 187 Wis. 2d 66, 77, 522 N.W.2d 554, 557 (Ct. App. 1994). When we review a discretionary decision, we examine the record to determine if the trial court logically interpreted the facts and applied the proper legal standard. *See State v. Rogers*, 196 Wis. 2d 817, 829, 539 N.W.2d 897, 902 (Ct. App. 1995).

The State's evidence indicating a connection between Petrovic and Fooden was relevant to the issue of drug delivery. Spang stated that he knew Fooden from previous drug investigations. Spang also noted Petrovic's relationship with Fooden. Because this evidence had a tendency to establish the proposition that Petrovic distributed drugs to Fooden, the evidence was relevant and properly admitted at trial. In addition, we are convinced that the probative value of the evidence outweighed any unfair prejudice resulting from it.

However, we are not persuaded that evidence of Petrovic's connection with the Outlaws was relevant to the issue of whether Petrovic delivered drugs. Although the State informed the court before trial that Petrovic had stated that Fooden was a member of the Outlaws, no evidence was presented during trial that

directly tied Fooden with the Outlaws. Spang testified that he had experience investigating different motorcycle clubs and that he had known of Fooden for a long time. However, Spang never stated that Fooden was in any way connected with the Outlaws. The State offered testimony relating to Outlaws buttons and photo albums apparently depicting Outlaws members, but this evidence proved to have no connection to Fooden or to the likelihood that Petrovic would sell marijuana to the Outlaws. Consequently, we conclude that the Outlaws buttons and photo albums had no relevance to the charges against Petrovic. Therefore, we find error in the trial court's admission of this evidence.

Nonetheless, the admission of evidence relating to the Outlaws amounts to harmless error. The test for harmless error is "whether there is a reasonable possibility that the error contributed to the conviction." *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231–32 (1985). The conviction must be reversed unless the court is certain that the error did not influence the jury. *See id.* at 541–42, 370 N.W.2d at 231. The burden of proving no prejudice is on the beneficiary of the error, here, the State. The State must establish that there is no reasonable possibility that the error contributed to the conviction. *See id.* at 543, 370 N.W.2d at 232.

Evidence suggesting an association between Petrovic and the Outlaws was limited to two items. First, Officer Jaekl briefly described two Outlaws buttons that were found in Petrovic's home. The buttons were but two of several items described by Jaekl as being found on top of Petrovic's bedroom dresser. Other items described by Jaekl included a roach clip, mari-

494

juana seeds and a couple of billing statements. Jaekl testified that these items were taken because they "tend[ed] to show who would be in possession of anything else that may be found in that room." Second, Officer Gibbs provided a brief description of the two photo albums that "appeared" to include pictures of Outlaws members. Amidst a substantial amount of other evidence directly revealing Petrovic's marijuana production, we cannot say that the admission of these items contributed to the conviction. We therefore conclude that the trial court's error was harmless.[8]

## C. Ineffective Assistance of Counsel

Finally, Petrovic asserts that her trial counsel was ineffective when he elicited testimony that she had invoked her Fifth Amendment right to remain silent and failed to object when the prosecutor presented testimony that she had invoked her right to remain silent. To establish a claim of ineffective assistance of counsel, a defendant has the burden to show that counsel's performance was deficient and that it prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We need not address both components of the test if the defendant fails to make a sufficient showing as to one of them. *See State v. Johnson*, 153 Wis. 2d 121, 128, 449 N.W.2d 845, 848 (1990). Whether counsel's actions constitute ineffective assistance presents a mixed question of law and fact. *See State v. Pitsch*, 124 Wis. 2d 628, 633–34, 369 N.W.2d 711, 714 (1985). The trial court's findings of what happened are factual and we will not overturn them unless they are clearly erro-

---

[8] We also note that the State never mentioned the Outlaws evidence during its closing argument to the jury.

neous. *See id.* at 634, 369 N.W.2d at 714. However, whether counsel's conduct as found by the trial court was deficient and prejudicial are both questions of law which we review de novo. *See id.* at 634, 369 N.W.2d at 715.

To prove deficient performance, a defendant must show that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *See Strickland,* 466 U.S. at 687. The appropriate measure of attorney performance is reasonableness under the circumstances. *See id.* at 690.

Petrovic contends that her counsel was ineffective for eliciting information from Spang about her refusal to answer certain questions while answering others. During her counsel's cross-examination of Spang, the following colloquy took place:

> Q. Did you ask her point blank whether she was involved in manufacturing controlled substance?
>
> A. Yes, sir.
>
> Q. What was her reply?
>
> A. She wouldn't answer.

Next, Petrovic points to a question presented by her counsel during recross-examination of Spang which allegedly was also in violation of Petrovic's right to remain silent:

> Q. You state that she didn't answer you when you asked her if she was involved with the plants. What was her demeanor at that time?[9]

---

[9] Although the trial court did not address this question, we consider it for the purpose of our review.

Citing *Doyle v. Ohio*, 426 U.S. 610, 618–19 (1976), and *State v. Fencl*, 109 Wis. 2d 224, 233–34, 325 N.W.2d 703, 709 (1982), Petrovic argues that her counsel's statements "violate the spirit" of the law which prohibits a prosecutor from impeaching a defendant based on his or her silence after being assured by *Miranda* warnings that silence carries no penalty. We conclude that Petrovic has not satisfied her burden of showing that her counsel's performance was deficient and prejudicial.

The State notes that "the record reveals that Spang's response was not what [Petrovic's counsel] expected when he inquired as to what Petrovic replied when asked if she was involved in manufacturing controlled substances." During motion hearings before trial, Petrovic's counsel stated that "[i]t's my understanding that [the police] asked, 'Are [the plants] yours, are you involved.' And the answer was no." These comments support the State's assertion that Petrovic's counsel understood her as having denied involvement in the manufacture of drugs. Additionally, Petrovic does not dispute that these comments represent what her counsel reasonably believed about her involvement. Consequently, we are satisfied that her counsel did not act unreasonably in unwittingly eliciting testimony that Petrovic had invoked her right to remain silent. Thus, once her counsel elicited from Spang that Petrovic had refused to answer Spang's questions about her drug involvement, it was not unreasonable for her counsel to specifically refer to Petrovic's silence because her decision to remain silent had already been revealed to the jury.

Petrovic next argues that her counsel was ineffective for failing to object when the prosecutor presented

testimony that Petrovic had invoked her right to remain silent. The prosecutor had the following exchange with Detective Heyrman during his direct examination:

> Q. Was she cooperative with you when you first made contact with her and started explaining these rights to her?
>
> A. She appeared to be cooperative and that she was willing to talk to me without an attorney as long as she could maintain the right to refuse certain questions.

As with her counsel's previous comment indicating that Petrovic chose not to answer certain questions, Heyrman's statement here was provided after her counsel had initially elicited testimony that Petrovic had invoked her right to remain silent. Similarly, her counsel's failure to object to Heyrman's testimony was not unreasonable because the information was already before the jury. Thus, we conclude that the trial court did not err in determining that the admission of this testimony did not prejudice Petrovic or undermine the confidence in the outcome of the trial. We affirm the trial court's decision.

*By the Court.*—Judgment affirmed.