In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-3120

ANTONIO G. RAMIREZ, JR.,

*Petitioner-Appellee,*

*v.*

LIZZIE TEGELS, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 14-cv-00802 — **James D. Peterson**, *Chief Judge.*

ARGUED JUNE 10, 2020 — DECIDED JUNE 23, 2020

Before FLAUM, BARRETT, and ST. EVE, *Circuit Judges.*

FLAUM, *Circuit Judge.* During Antonio Ramirez's 2001 criminal trial in Wisconsin state court, the prevailing interpretation of the Sixth Amendment's Confrontation Clause was set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). Under *Roberts*, a defendant had no confrontation right to cross-examine an unavailable declarant if the declarant's statements were adequately reliable, which could be established where the statements fell within a firmly rooted hearsay exception. *Id.* at 66.

Applying hearsay exceptions, the trial court admitted several out-of-court statements accusing Mr. Ramirez of sexually assaulting his stepdaughter in November 1998 and September 1999. The jury convicted Mr. Ramirez of multiple counts relating to the sexual assaults.

In 2004, while Mr. Ramirez's conviction was pending on direct review, the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), which overruled *Roberts* by holding that a defendant is entitled to cross-examine a declarant if the declarant's statements were "testimonial"—*e.g.*, were statements that the declarant "would reasonably expect to be used prosecutorially." *Id.* at 51. During direct review of his conviction, Mr. Ramirez urged his lawyer, Attorney Lynn Hackbarth, to raise a confrontation claim under *Crawford*. Attorney Hackbarth chose instead to raise a litany of other claims, each of which Wisconsin state courts rejected.

After Mr. Ramirez exhausted his state court remedies, he filed a petition for a writ of habeas corpus in federal district court, arguing that Attorney Hackbarth's representation was ineffective based on her omission of the confrontation claim. The district court agreed and granted Mr. Ramirez's petition, ordering the State of Wisconsin[1] to provide Mr. Ramirez with a new appeal or release him within ninety days. The State now appeals, contending that the confrontation claim was not clearly stronger than the claims Attorney Hackbarth raised.

We affirm. An attorney exercising reasonable professional judgment would have recognized that the confrontation claim

---

[1] Lizzie Tegels, Warden of Jackson Correctional Institution (where Mr. Ramirez is confined), is the named respondent-appellant. For readability purposes, we refer to the respondent-appellant as the "State."

was clearly stronger than the claims Attorney Hackbarth raised. Raising a confrontation claim while Mr. Ramirez's conviction was pending on direct review would have given Mr. Ramirez a reasonable chance of prevailing.

## I. Background

A Wisconsin jury convicted Mr. Ramirez of multiple counts relating to the November 1998 and September 1999 sexual assaults of his stepdaughter ("M.G."), who was seven and eight years old at the times of the respective assaults. M.G. did not testify at Mr. Ramirez's trial despite a subpoena served on her mother, Cynthia Ramirez ("Mrs. Ramirez"), requesting M.G.'s testimony. M.G.'s brother ("A.R."), who was five years old in September 1999, also did not testify. Notwithstanding their absence, the trial court admitted M.G.'s and A.R.'s out-of-court statements through law enforcement officers and medical professionals. After Mr. Ramirez's 2001 trial, he lodged direct and collateral attacks against his convictions.

### A. Pretrial and Trial Proceedings

Before trial, M.G. and Mrs. Ramirez sent letters to the court recanting their previous statements accusing Mr. Ramirez of the assaults. The jury apparently never heard evidence regarding M.G.'s recantation. Before jury selection on the first day of trial, Mr. Ramirez's trial counsel explained to the court that Mrs. Ramirez had written in her letters that she had "instructed [M.G.] what to say because of rage at her husband," Mr. Ramirez. Counsel argued that this presented "an issue on confrontation and the issue of residual hearsay exemptions and indicia of trustworthiness in reference to" M.G.'s out-of-court statements. Mr. Ramirez's trial counsel

also explained that she had not filed a motion *in limine* to exclude out-of-court statements because she did not know who was going to testify. She nevertheless objected to the admission of those statements as hearsay, citing, among other cases, *State v. Petrovic*, 592 N.W.2d 238 (Wis. Ct. App. 1999), which addressed a hearsay claim in part as a Confrontation Clause claim.

Before and during trial, Mr. Ramirez's trial counsel further objected to the admission of out-of-court statements on the grounds that those statements were hearsay and did not have adequate "indicia of reliability" or "guarantees of trustworthiness." On one occasion, Mr. Ramirez's trial counsel objected to the admission of M.G.'s out-of-court statements, arguing that "[t]he issue of course is confrontation as to the hearsay." The district court generally overruled the objections, admitting the statements under hearsay exceptions.

Police officer George Larson testified at trial that he responded to a call from Mrs. Ramirez on September 5, 1999. Mrs. Ramirez told Officer Larson that when she returned to her apartment after an errand, she initially could not enter the apartment because the interior chain lock was latched, which she described as "not normal." Mrs. Ramirez forced the door open, and then she saw Mr. Ramirez coming out of M.G.'s bedroom while pulling up his shorts. Mrs. Ramirez also saw M.G. sitting on the toilet with "a look on her face." A.R., who was present at the apartment, told Mrs. Ramirez "[t]hat daddy had [M.G] on the bed face down, and there were boogers on the bed." Mrs. Ramirez also told Officer Larson that she had argued with Mr. Ramirez, and that Mr. Ramirez had bitten her shoulder and tried to prevent her from leaving

the apartment. Mrs. Ramirez ultimately escaped and took M.G. and A.R. to her mother's house.

After hearing these allegations, Officer Larson told Mrs. Ramirez that she and M.G. "had to go to the hospital" where M.G. "would be examined because [Mrs. Ramirez] was accusing [Mr. Ramirez] of a serious crime." Officer Larson then drove Mrs. Ramirez and M.G. in his squad car to the emergency room, where M.G. was evaluated for sexual assault. Officer Larson also arranged Mr. Ramirez's arrest.

Nurse Donna Karpowicz-Halpin testified that after spending about thirty to forty-five minutes building a rapport with M.G. in the hospital examination room, she began to ask M.G. about the assault. M.G. said that "her dad had taken off her pants and [then] he took off his pants, and she was laying on her belly on the bed."[2] M.G. then said that Mr. Ramirez "put his pee-pee by her butt … like on top of her." Afterward, M.G. "felt something by her butt, so she went into the bathroom and … wiped herself with some tissue and threw it in the wastepaper basket."

Officer Larson remained in the examination room and participated in the questioning of M.G., including by asking M.G. to point to the parts of a teddy bear where Mr. Ramirez had touched her. When M.G. said she had wiped herself off and threw the tissue in the bathroom wastebasket, Officer Larson stepped out to let an evidence technician know about the potential evidence in the wastebasket.

---

[2] Although Mr. Ramirez is M.G.'s stepfather, the parties have not disputed that M.G. and A.R. referred to Mr. Ramirez as "dad," "daddy," or "father."

Nurse Karpowicz-Halpin asked M.G. if this was the first time something like this had happened. M.G. said that it was not. Mrs. Ramirez then asked M.G. if "when she went to [the hospital] for her vaginal bleeding [in November 1998,] did she really hurt herself on the bathtub." According to Nurse Karpowicz-Halpin, M.G. said, "No, she hadn't." M.G. said "that dad had—was trying to put his pee-pee inside of her and that's how she got cut. That it wasn't the bathtub." M.G. also said that Mr. Ramirez threatened to hurt her little brother, mom, or grandma if she told anyone about what he had done.

Officer Larson returned to the examination room at some point during the examination. Although it is unclear from the record when exactly Officer Larson returned, he was likely absent when M.G. explained that Mr. Ramirez had caused her November 1998 injuries, because Officer Larson learned from Mrs. Ramirez (not from M.G.) that M.G. accused Mr. Ramirez of that assault.

Emergency physician Suzanne Siegel also spoke with M.G. and Mrs. Ramirez in the examination room. Dr. Siegel testified that when she asked M.G. what had happened, M.G. responded that her father "had put his pee-pee by her. And she pointed to her buttock area." Upon conducting a physical exam, Dr. Siegel testified that she observed "a milky discharge coming from [M.G.'s] vaginal area" not normally seen in a small child, and that M.G.'s vaginal area was red and irritated. Dr. Siegel then put M.G. under a "Woods lamp" that indicated the potential presence of semen on parts of her legs. Dr. Siegel opined that her observations were consistent with sexual misuse and that the redness could have resulted from the rubbing of that area. Swabs from around M.G.'s outer vaginal area, M.G.'s underwear, and tissues recovered from the

bathroom wastebasket tested positive for the presence of semen, sperm cells, or both. The semen and sperm cell DNA matched Mr. Ramirez's.[3]

Obstetrician and gynecologist Michael Schellpfeffer treated M.G. on November 8, 1998. Dr. Schellpfeffer testified that he had received a report that M.G.'s injury was a "straddle injury on a bathtub," but that M.G. had lacerations to her perineum and the lower portion of her vagina that were "not at all typical of … straddle injuries that [he] had … taken care of," which usually involved external bruising. Dr. Schellpfeffer testified that he surgically repaired the injuries, which were "very much like an episiotomy" and "certainly consistent possibly with a penetrating injury." Dr. Schellpfeffer also granted that it was possible that slipping and falling on an object caused the injury. The hospital did not find any seminal material on M.G. Dr. Schellpfeffer testified that when he had asked Mrs. Ramirez if M.G. could have been sexually abused, Mrs. Ramirez stated that she knew of no such abuse.

Detective John Gregory interviewed Mrs. Ramirez after the September 1999 assault. Mrs. Ramirez told him that M.G. had said that Mr. Ramirez had caused M.G.'s vaginal lacerations in November 1998. Mrs. Ramirez also explained that she had to force open the door to the apartment, found Mr. Ramirez coming out of M.G.'s bedroom while pulling up his shorts, and saw M.G. in the bathroom.

---

[3] Specifically, there was a one in 20 trillion chance that the DNA evidence from the tissues and underwear belonged to a Hispanic male other than Mr. Ramirez, and a one in 400,000 chance that the DNA found on the vaginal swab belonged to a Hispanic male other than Mr. Ramirez.

Detective Gregory interviewed M.G. and A.R., as well. Detective Gregory testified that M.G. told him that Mr. Ramirez told A.R. to watch television in Mrs. Ramirez's room and then took M.G. into her own bedroom. Mr. Ramirez then took off his clothes and had M.G. do the same. Mr. Ramirez subsequently had M.G. lie face down on the bed and rubbed his penis against her buttocks. Detective Gregory further testified that A.R. told him that he saw Mr. Ramirez with his shorts off in the bedroom with M.G., and that he later saw "white boogers on the bed." Investigators who collected evidence at the home searched for but did not find seminal material on the bed.

When Mrs. Ramirez took the stand, she testified that she had falsely accused Mr. Ramirez of the assaults and coached M.G. to do the same "to get back at" Mr. Ramirez. Mrs. Ramirez testified that she wanted Mr. Ramirez to go to jail because she was angry that Mr. Ramirez's ex-girlfriend had called the house shortly before the alleged September 1999 assault, she suspected him of infidelity, and she was angry that he had gotten too drunk in front of her family. Mrs. Ramirez also denied breaking the chain on the door of the apartment, seeing Mr. Ramirez pulling up the shorts at the door to M.G.'s room, and that M.G. had ever said anything about Mr. Ramirez causing her November 1998 injuries. She further testified that Mr. Ramirez had not attacked her and that A.R. had never told her that he saw Mr. Ramirez on top of M.G. or "boogers" on the bed.

Mrs. Ramirez had sex with Mr. Ramirez the morning of the September 1999 assault and had access to a used condom containing Mr. Ramirez's semen. She nevertheless denied

planting Mr. Ramirez's semen on M.G.'s body and under-wear. But defense counsel argued in closing that as part of Mrs. Ramirez's framing of Mr. Ramirez, she planted Mr. Ramirez's semen on M.G.'s underwear. The jury apparently did not credit this argument and convicted Mr. Ramirez on all counts relating to the November 1998 and September 1999 sexual assaults.

Specifically, as to the November 1998 assault, the jury found Mr. Ramirez guilty of first-degree sexual assault of a child under the age of 13 (Count I) and first-degree sexual assault causing great bodily harm (Count II). As to the September 1999 assault, the jury found Mr. Ramirez guilty of child enticement (Count III) and first-degree sexual assault of a child under the age of 13 (Count IV). The jury acquitted Mr. Ramirez on charges of battery and false imprisonment, which were based on Mrs. Ramirez's allegations that he had bitten her shoulder and tried to prevent her from leaving the apartment after the September 1999 assault.

The court imposed two concurrent 40-year prison terms on the counts associated with the November 1998 assault (Counts I & II); a consecutive 10-year prison term on the child enticement count associated with the September 1999 assault (Count III); and 30 years of probation on the sexual assault of a child count associated with the September 1999 assault (Count IV).

### B. Direct Review

After sentencing, Mr. Ramirez's appointed attorney reported that there was no merit in an appeal of Mr. Ramirez's convictions, which triggered a no-merit proceeding. *See* Wis.

Stat. § 809.32 (setting forth procedure when appointed attorney finds no merit in appeal within meaning of *Anders v. California*, 386 U.S. 738 (1967)). While the no-merit proceeding was ongoing, the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), which overruled *Ohio v. Roberts*, 448 U.S. 56 (1980), and transformed the standard for determining whether out-of-court statements are admissible under the Confrontation Clause. Whereas under *Roberts*, the focus of a confrontation claim had been on whether the out-of-court statements bore "adequate 'indicia of reliability,'" 448 U.S. at 66, the key inquiry under *Crawford* became whether the statements were "testimonial," 541 U.S. at 51.

The Wisconsin Court of Appeals ultimately rejected the no-merit report, which resulted in the appointment of a new lawyer for Mr. Ramirez, Attorney Lynn Hackbarth, who is the subject of Mr. Ramirez's ineffective assistance claim. Attorney Hackbarth initiated Mr. Ramirez's direct review process in 2005 by filing a postconviction motion in the circuit court pursuant to Wis. Stat. § 809.30(2)(h), raising ineffective-assistance-of-trial-counsel claims, a speedy-trial claim, and an abuse-of-discretion sentencing claim, but not a confrontation claim. After an evidentiary hearing, the circuit court denied the postconviction motion.

Attorney Hackbarth subsequently appealed to the Wisconsin Court of Appeals, raising the same claims from the postconviction motion plus several other claims. In total, she raised the following claims: (1) Mr. Ramirez was denied his constitutional right to a speedy trial; (2) the November 1998 and September 1999 charges were improperly joined for trial; (3) the trial court erroneously exercised its discretion in ad-

mitting some of the hearsay statements; (4) the prosecutor engaged in misconduct; (5) the evidence was insufficient to support Mr. Ramirez's conviction; (6) trial counsel rendered ineffective assistance by not retaining a DNA expert and not raising a chain-of-custody objection to the crime lab report; and (7) the court erroneously exercised its sentencing discretion.

Mr. Ramirez had written letters to Attorney Hackbarth requesting that she raise a confrontation claim under *Crawford*, but Attorney Hackbarth did not heed the request. The Wisconsin Court of Appeals rejected all of the claims Attorney Hackbarth raised, and the Wisconsin Supreme Court denied Mr. Ramirez's petition for review in 2007.

### C. Collateral Review

In 2008, Mr. Ramirez filed a pro se petition for a writ of habeas corpus in the Wisconsin Court of Appeals alleging, among other things, that Attorney Hackbarth had provided ineffective assistance by failing to raise a confrontation claim on direct review. The court rejected the petition in 2010, in part because the court of appeals was the wrong venue in which to argue that Attorney Hackbarth should have raised a confrontation claim in the postconviction motion she filed in the circuit court. Instead of filing his petition in the court of appeals pursuant to *State v. Knight*, 484 N.W.2d 540, 545 (Wis. 1992), Mr. Ramirez needed to file his petition in the circuit court pursuant to *State ex rel. Rothering v. McCaughtry*, 556 N.W.2d 136, 137 (Wis. Ct. App. 1996).

So, later in 2010, Mr. Ramirez filed his *Rothering* petition in the circuit court. The court denied the petition in 2013, rejecting the ineffective assistance claim because the "bulk" of

the out-of-court statements were admitted "on the basis of being excited utterances or the purpose of medical diagnosis or treatment and were therefore not testimonial in nature." The circuit court concluded that the testimonial statements, such as those taken by law enforcement, were cumulative, and that the admission of those statements was harmless in light of other "overwhelming" evidence of Mr. Ramirez's guilt.

Mr. Ramirez appealed, and the Wisconsin Court of Appeals affirmed the circuit court's order in 2014. The court of appeals concluded, based on *State v. Lagundoye*, 674 N.W.2d 526 (Wis. 2004), that *Crawford* did not apply retroactively on collateral review, and it therefore did not reach of the merits of Mr. Ramirez's claim that Attorney Hackbarth had rendered ineffective assistance. Mr. Ramirez unsuccessfully petitioned the Wisconsin Supreme Court for review in 2014.

### D. Federal Habeas Petition

Finally, in November 2014, Mr. Ramirez filed a petition for a writ of habeas corpus in federal district court under 28 U.S.C. § 2254 arguing, among other things, that Attorney Hackbarth had been ineffective for not raising a confrontation claim during direct review. In 2018, the district court concluded that the Wisconsin Court of Appeals' rejection of that claim was based on an unreasonable interpretation of *Whorton v. Bockting*, 549 U.S. 406 (2007). The district court explained that when Attorney Hackbarth filed the postconviction motion in the circuit court to initiate direct review in 2005, *Crawford*'s new rule applied, citing *Griffith v. Kentucky*, 479 U.S. 314, 322 (1987) (holding that new constitutional rules apply to cases pending on direct review). The district court further elaborated that "[n]othing in *Whorton* precludes a petitioner from raising a claim of ineffective assistance of postconviction

counsel based on *Crawford* in a collateral proceeding, so long as the petitioner's conviction was not final on direct review at the time of the *Crawford* decision." Indeed, the Supreme Court decided *Crawford* in 2004, and Mr. Ramirez's conviction did not become final on direct review until 2007.

Following its initial 2018 opinion, and after considering further briefing on the merits, the district court ultimately concluded that Attorney Hackbarth's representation was deficient because she did not raise the *Crawford* claim, which was "clearly stronger" than the claims she had raised, and that Mr. Ramirez had shown a reasonable chance of success on direct review but for the deficient representation. The district court therefore issued a conditional writ of habeas corpus, ordering the State to release Mr. Ramirez from custody or grant him a new appeal within ninety days. The State appealed, and the district court stayed its judgment pending resolution of this appeal.

## II. Discussion

Generally, if a state court has adjudicated a habeas petitioner's claim on the merits, we grant the state court deference under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d). *Toliver v. Pollard*, 688 F.3d 853, 859 (7th Cir. 2012). In such cases, "habeas relief may be granted only if the state court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or if it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* (quoting 28 U.S.C. § 2254(d)).

Here, however, we agree with the parties that AEDPA deference does not apply. "When no state court has squarely addressed the merits of a habeas claim, we review the claim under the pre-AEDPA standard of 28 U.S.C. § 2243, under which we dispose of the matter as law and justice require." *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citations and internal quotation marks omitted). The Wisconsin Court of Appeals, contrary to *Strickland v. Washington*, 466 U.S. 668 (1984) and *Griffith v. Kentucky*, 479 U.S. 314 (1987), did not review the merits of Mr. Ramirez's claim that Attorney Hackbarth provided ineffective assistance for failing to raise the confrontation claim.

The Wisconsin Circuit Court also appears to have "inadvertently overlooked" the ineffective assistance claim. *Johnson v. Williams*, 568 U.S. 289, 303 (2013); *see also id.* at 302–03 ("If a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the [merits]."). The circuit court, purporting to rule on the ineffective assistance claim, essentially ruled on the merits of the confrontation claim instead. There is no indication, for example, that the circuit court considered a critical question for the ineffective assistance claim—that is, whether the *Crawford* claim was "clearly stronger" than the claims Attorney Hackbarth raised on direct review. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) (approving this court's "clearly stronger" standard for ineffective assistance of appellate counsel claims).

We therefore review the ineffective assistance claim de novo, *see Adorno v. Melvin*, 876 F.3d 917, 921 (7th Cir. 2017), but our review of Attorney Hackbarth's performance is "most deferential" to her reasonable professional judgment, *Harrington v. Richter*, 562 U.S. 86, 105 (2011). For Mr. Ramirez to

establish that Attorney Hackbarth's assistance was ineffective, Mr. Ramirez must show that Attorney Hackbarth's performance was deficient and that this deficiency prejudiced him. *Strickland*, 466 U.S. at 687. If Attorney Hackbarth "abandoned a nonfrivolous claim that was both 'obvious' and 'clearly stronger' than the claim[s] that [s]he actually presented, [her] performance was deficient, unless [her] choice had a strategic justification." *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013). Attorney Hackbarth's deficient performance prejudiced Mr. Ramirez if "there is a reasonable probability that raising the issue would have made a difference in the outcome of the appeal." *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000). "A defendant whose lawyer does not provide him with effective assistance on direct appeal and who is prejudiced by the deprivation is thus entitled to a new appeal." *Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir. 1996).

The State acknowledges that Mr. Ramirez's confrontation claim was obvious, and that all of the claims Attorney Hackbarth raised during direct review were weak. The State nevertheless contends that the confrontation claim was also "quite weak" because Mr. Ramirez's trial counsel did not adequately preserve the claim, the claim rested on unsettled law regarding what constitutes a testimonial statement, and the contested statements were either nontestimonial or duplicative of the nontestimonial statements. The State further argues that the omission of the confrontation claim did not prejudice Mr. Ramirez because Wisconsin courts would have rejected the claim given that the evidence against Mr. Ramirez was otherwise overwhelming. Mr. Ramirez responds that the confrontation claim was clearly stronger than the claims Attorney

Hackbarth raised, and that he had a reasonable chance of success on appeal but for Attorney Hackbarth's ineffective assistance.

**A. Deficient Performance**

We conclude, based on Confrontation Clause caselaw as it stood when Mr. Ramirez's convictions were pending on direct review, that an attorney exercising reasonable professional judgment would have recognized that the confrontation claim was clearly stronger than the claims Attorney Hackbarth raised. Moreover, Mr. Ramirez's trial counsel made confrontation objections at trial, and Attorney Hackbarth could have made strong arguments that the Wisconsin courts should grant relief on the merits of the confrontation claim even assuming the claim was forfeited.

*1. Clearly Stronger*

Attorney Hackbarth's assistance during the direct review of Mr. Ramirez's conviction was deficient because she did not raise a confrontation claim, which was clearly stronger than the claims she raised. The Confrontation Clause of the Sixth Amendment to the U.S. Constitution grants every criminal defendant the right "to be confronted with the witnesses against him." At the time of Mr. Ramirez's 2001 trial, the Supreme Court had interpreted the Confrontation Clause to allow the admission of hearsay only if the declarant was unavailable and the statement bore "adequate 'indicia of reliability'" or "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), *overruled by Crawford v. Washington*, 541 U.S. 36 (2004). Reliability could "be inferred without more in a case where the evidence [fell] within a firmly rooted hearsay exception." *Id.*

As noted earlier, however, in 2004 the Supreme Court overruled *Roberts*, holding in *Crawford* that out-of-court statements that are "testimonial"—*e.g.*, that the declarant "would reasonably expect to be used prosecutorially"—are inadmissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. 541 U.S. at 51, 59. Mr. Ramirez's case was still pending on direct review in 2006 when the Supreme Court decided *Davis v. Washington*, holding that statements "are testimonial when the circumstances objectively indicate that there is no … ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. 813, 822 (2006). Mr. Ramirez's convictions did not become final on direct review until 2007; hence, *Crawford* and *Davis* applied to his case. *See Griffith*, 479 U.S. at 322 ("[F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication.").

An attorney exercising reasonable professional judgment would have concluded that *Crawford* gave Mr. Ramirez a promising confrontation claim during the direct review of his conviction. *Davis* would have cemented this conclusion. We make this determination by evaluating Attorney Hackbarth's "performance from the perspective of a reasonable attorney at the time of [Mr. Ramirez]'s appeal, taking care to avoid 'the distorting effects of hindsight.'" *Shaw*, 721 F.3d at 915 (quoting *Strickland*, 466 U.S. at 689). An attorney is not required to anticipate changes in the law that were not sufficiently foreshadowed in existing caselaw. *Shaw*, 721 F.3d at 916–17. And the State does not argue that then-existing precedent— namely, *Crawford* and *Davis*—somehow foreshadowed an imminent change in the law that would have given Attorney

Hackbarth a strategic reason for declining to raise a confrontation claim. Rather, the state simply argues that Confrontation Clause caselaw was "unsettled" at the time of direct review, such that Attorney Hackbarth could not have known whether the Wisconsin courts would conclude that the relevant statements were testimonial.

It is true that Confrontation Clause cases decided after Mr. Ramirez's appeal became final in 2007 have applied additional interpretive gloss to the kinds of factual circumstances that might contribute to a determination that a statement is testimonial. But that subsequent gloss was not necessary for Attorney Hackbarth to fashion an argument that M.G.'s and A.R.'s out-of-court statements were testimonial. Indeed, the State concedes that the confrontation claim was "obvious" while Mr. Ramirez's convictions were pending on direct review.

Attorney Hackbarth could have argued, for example, that there was no ongoing emergency at the time M.G. and A.R. made their out-of-court statements given that Officer Larson had already arranged for Mr. Ramirez's arrest, so there was no risk of releasing M.G. or A.R. into Mr. Ramirez's custody. Attorney Hackbarth also could have argued that M.G. and A.R. had made nearly all of their out-of-court statements for the primary purpose of prosecution.

Mrs. Ramirez testified that she wanted Mr. Ramirez arrested because she was mad at him, and that she had coached M.G. to falsely accuse Mr. Ramirez of sexual assault. A reviewing court could therefore conclude that Mrs. Ramirez caused her children to make their statements for the primary purpose of prosecution. Indeed, the State concedes that the

out-of-court statements eight-year-old M.G. made to Detective Gregory after the September 1999 assault were testimonial. This concession suggests that M.G., despite her young age, was capable of understanding that her other statements could have been made for the primary purpose of prosecution as well. In the "Summary of Argument" section of the State's opening brief, it concedes that the statements of *both* M.G. and A.R. to Detective Gregory were testimonial. Although the State appears to have later walked back that concession as to A.R.'s statements, it has failed to develop any argument as to why A.R. was differently situated.

There was also a relatively strong argument that many of the out-of-court statements M.G. made during her examination at the hospital were testimonial. Officer Larson drove M.G. and Mrs. Ramirez to the hospital. Mrs. Ramirez and M.G. did not independently decide to go to the hospital to seek medical treatment; Officer Larson told them that they "had to go to the hospital" where M.G. "would be examined because [Mrs. Ramirez] was accusing [Mr. Ramirez] of a serious crime."

Once at the hospital, although medical professionals appear to have conducted most of the questioning, Officer Larson was present and involved for at least some of the questioning. Officer Larson offered M.G. a teddy bear, which she used to show him where Mr. Ramirez had touched her. Immediately after the sexual assault examination, hospital staff reported to law enforcement what had happened in the examination room and provided evidence to law enforcement, regardless of whether Officer Larson was in the room.

Hence, at least some of the questioning in the hospital examination room arguably functioned as a substitute for a police interrogation. The conclusion that the State urges us to reach—that statements made "during the course of receiving medical treatment" are *per se* non-testimonial—would invite law enforcement officers simply to escort victims of any violent crime to a hospital (regardless of whether the victim sought or desired medical treatment), where law enforcement could then work with medical professionals to elicit testimonial statements from the victim in circumvention of the Confrontation Clause's protections.

We acknowledge that M.G.'s statements during her examination regarding what happened to her and whether she was hurting may have been for the primary purpose of receiving medical treatment rather than for prosecutorial purposes. But it is more likely M.G.'s other statements, such as those about where the assault happened and the identity of her abuser, were made for the primary purpose of "prov[ing] past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. There was a strong argument to be made that M.G.'s statements regarding the November 1998 assault that had occurred almost a year earlier, in particular, were made to "prove past events potentially relevant to later criminal prosecution." *Id.*

For present purposes, however, we need not determine precisely which statements would not have been admitted under the Confrontation Clause as it was interpreted in 2007. What we conclude here is simply that an attorney exercising reasonable professional judgment would have raised a confrontation claim under *Crawford* while Mr. Ramirez's conviction was still pending on direct review.

By all means, showing "that an unraised claim is clearly stronger than a claim that was raised is generally difficult 'because the comparative strength of two claims is usually debatable.'" *Makiel v. Butler*, 782 F.3d 882, 898 (7th Cir. 2015) (quoting *Shaw*, 721 F.3d at 915). The State concedes here, however, that the claims Attorney Hackbarth raised were weak. In fact, the State has not identified any specific claim Attorney Hackbarth raised that rivaled the strength of the unraised *Crawford* claim. The hurdle Mr. Ramirez therefore needed to clear to establish that the confrontation claim was clearly stronger than those weak claims was not particularly high, and the confrontation claim clears that hurdle. The confrontation claim would have given Mr. Ramirez his best chance at having some of the most inculpatory evidence against him deemed inadmissible.

### 2. Possible Forfeiture

Mr. Ramirez's possible forfeiture of his confrontation claim does not alter our conclusion. Attorney Hackbarth could have made strong arguments that Mr. Ramirez's trial counsel had preserved the confrontation claim, and that even if it were unpreserved, Wisconsin courts should nevertheless grant relief on the merits.

As an initial matter, Attorney Hackbarth could have argued that Mr. Ramirez's trial counsel adequately preserved the confrontation claim. Wisconsin courts treat an objection as "sufficient to preserve an issue for appeal if it apprises the court of the specific grounds upon which it is based." *In Interest of Corey J.G.*, 572 N.W.2d 845, 849 (Wis. 1998). Making a hearsay objection is generally insufficient to preserve a confrontation claim. *State v. Nelson*, 406 N.W.2d 385, 393–94 (Wis. 1987). Here, however, Mr. Ramirez's trial counsel objected to

the admission of M.G.'s out-of-court statements because it presented an "issue on confrontation" on one occasion, and she raised "confrontation as to the hearsay" on another occasion.

She also cited caselaw discussing the confrontation right, and she generally referenced the "indicia of reliability" and "guarantees of trustworthiness" standards that were then-applicable to confrontation claims. *See Roberts*, 448 U.S. at 66 (explaining that statement is admissible under Confrontation Clause if declarant is unavailable and statement bears adequate "indicia of reliability" or "guarantees of trustworthiness"), *overruled by Crawford*, 541 U.S. at 51, 59. Further, a statement met the "indicia of reliability" requirement if it fell "within a firmly rooted hearsay exception," *Roberts*, 448 U.S. at 66, so the other hearsay objections may have fed into the confrontation objections.

Even if the confrontation claim was unpreserved, however, the claim was still plainly stronger than the claims Attorney Hackbarth raised given the strong arguments she could have made that Wisconsin state courts should nevertheless grant relief on the merits of the claim. The Supreme Court has explained that "[i]n most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved errors," *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017); but, of course, "most" does not mean "all."

The State concedes that "Wisconsin courts, like others, have the discretion to ignore forfeiture (or waiver) and reach the merits of an unpreserved claim." In fact, Wisconsin courts of appeals have proceeded to review the merits of confrontation claims after *Crawford* even though the defendants did not make confrontation objections at trial. *See, e.g., State v. Searcy*,

709 N.W.2d 497, 509 n.8 (Wis. Ct. App. 2005); *State v. Savanh*, 707 N.W.2d 549, 882 n.2 (Wis. Ct. App. 2005). In those cases, as here, the defendant could not have made a confrontation objection at trial based on *Crawford* because *Crawford* had not yet been decided.[4] A reasonably prudent lawyer would have recognized that Mr. Ramirez had a strong argument that the Wisconsin courts should review (and ultimately grant relief on) the merits of his claim in light of the intervening change in law. With Attorney Hackbarth's deficient performance established, we turn to whether the deficient performance prejudiced Mr. Ramirez's appeal.

**B. Prejudice**

We conclude that Mr. Ramirez "had a reasonable chance of success on appeal but for [Attorney Hackbarth's] deficient performance." *Shaw v. Wilson*, 721 F.3d 908, 919 (7th Cir. 2013). We need not decide whether Mr. Ramirez would have prevailed; rather, what we decide here is that the confrontation claim "had a better than fighting chance at the time." *Jones v. Zatecky*, 917 F.3d 578, 583 (7th Cir. 2019) (quoting *Shaw*, 721 F.3d at 916). This is not a case where the unraised claim was clearly stronger than the raised claims, yet still doomed to fail. If Attorney Hackbarth had raised a confrontation claim during direct review, there is a reasonable chance that the Wisconsin courts would have concluded that at least some of the probative out-of-court statements were inadmissible, and that the admission of those statements was not harmless error.

---

[4] The case cited by the State, *State v. Ellington*, is inapposite because the defendant in that case conceded that the relevant statements were not testimonial under *Crawford*. 707 N.W.2d 907, 914 (Wis. Ct. App. 2005).

The State argues that the testimonial out-of-court statements were duplicative of statements that were properly admitted. As explained above, however, it is arguable that nearly *all* of M.G.'s and A.R.'s statements were testimonial, particularly in light of Mrs. Ramirez's testimony that she coached M.G. to falsely accuse Mr. Ramirez and law enforcement's involvement in M.G.'s hospital examination. The State concedes that M.G.'s statements to Detective Gregory were testimonial and has developed no argument as to why A.R.'s statements to Detective Gregory should be viewed differently. There is also a reasonable probability that the Wisconsin courts would conclude, in particular, that M.G.'s statements about the November 1998 assault, M.G.'s statements about certain details of the September 1999 assault, and M.G.'s response to Officer Larson's request for M.G. to point to where on the teddy bear Mr. Ramirez touched her were made for the primary purpose of establishing past events for a future prosecution.

To the extent that any inadmissible statements were duplicative of admissible statements, the Wisconsin courts may well conclude that the jury would have assigned less weight to the properly admitted statements if it had not heard that those statements had been repeated to different persons in different contexts. Indeed, the State argued in closing at trial that the defense's theory that Mrs. Ramirez framed Mr. Ramirez should be discounted, in part, because it would not have been possible for Mrs. Ramirez to get M.G. to make a "consistent series of statements to [Officer] Larson, Nurse [Karpowicz-]Halpin, Dr. Siegel, and then Detective Gregory."

The evidence against Mr. Ramirez is not overwhelming if the contested statements are excluded, particularly with respect to the November 1998 assault. M.G.'s out-of-court statements accusing Mr. Ramirez of the November 1998 assault were the only evidence presented connecting Mr. Ramirez to that assault. If those statements had been excluded, the State would not have been able to prove the counts relating to the November 1998 assault. Even if the Wisconsin courts concluded that M.G.'s statements relating to the November 1998 assault were the only statements that were inadmissible, the counts relating to that assault came with the longest sentences (the concurrent 40-year prison terms).

The Wisconsin courts may well have also concluded that the contested out-of-court statements relating to the September 1999 assault were inadmissible, and that the admission of those statements was not harmless. Granted, DNA evidence connects Mr. Ramirez to the September 1999 assault. That said, Mrs. Ramirez testified at trial that she fabricated the entire sexual assault accusation and coached M.G. to lie because she was angry at Mr. Ramirez. Although Mrs. Ramirez denied planting the DNA evidence, defense counsel argued that she did. Mrs. Ramirez had sex with Mr. Ramirez on the morning of the September 1999 assault, and she therefore had access to Mr. Ramirez's semen in a recently used condom. Investigators found DNA evidence in M.G.'s underwear, on toilet paper in the wastebasket, and on the outside of M.G.'s body, but they did not locate any inside of her body. Moreover, Dr. Siegel testified that M.G.'s vaginal redness was consistent with rubbing of that area. If the jury had not heard testimony concerning the contested out-of-court statements, it might have credited defense counsel's argument that Mrs. Ramirez

planted the semen as part of her framing of Mr. Ramirez. Indeed, the jury demonstrated that it doubted Mrs. Ramirez's truthfulness by acquitting Mr. Ramirez on the charges of battery and false imprisonment, which were based on Mrs. Ramirez's allegations that Mr. Ramirez had bit her shoulder and tried to prevent her from leaving the apartment.

The Wisconsin courts, of course, did not have an opportunity to address these issues during the direct review of Mr. Ramirez's conviction because Attorney Hackbarth did not raise a confrontation claim. There is at least a reasonable probability that raising such a claim would have made a difference in the outcome of Mr. Ramirez's appeal.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's order granting habeas relief. The State must, within ninety days, either release Mr. Ramirez from custody or grant him a new appeal in which he may advance his confrontation claim.